Argued July 1; modified July 14; rehearing denied
September 15, 1936

# OREGON, CALIFORNIA & EASTERN RAILWAY CO. *v.* BLACKMER

(59 P. (2d) 694)

*Charles A. Hart*, of Portland (R. C. Groesbeck, of Klamath Falls, and Alfred A. Hampson and R. R. Morris, both of Portland, on the brief), for appellant.

*William Kuykendall*, of Klamath Falls (Harry D. Boivin, of Klamath Falls, on the brief), for respondent.

CAMPBELL, C. J. Plaintiff owns and operates a railroad running from the city of Klamath Falls in an easterly direction for a distance of about 65 miles to the town of Bly, all in Klamath county, Oregon. The stock of said company is owned by the Southern Pacific Company and the Great Northern Railway Company in equal amounts. Said road is managed by the joint owners alternating yearly, but functions as a separate and independent corporation, making its own tariffs, keeping its own audits and rents most of its equipment from the owner who is operating it for the time being. The company is organized as a corporation under the laws of the state of Nevada and is duly authorized to do business as a common carrier in the state of Oregon.

The business tributary to said road is not extensive and consists mostly of the transportation of logs and an occasional carload of lumber. It engages in no passenger business. On occasion it transports cattle and also carries a small amount of freight amounting to two or three hundred pounds per day. For much of the greater part of the time, it operates but one train a day, said train making one round trip—that is, there is only one train going in either direction at any given time between the termini of the road. This train is operated by a crew consisting of an engineer, fireman, conductor, and two brakemen. It sometimes operates a train of more than 40 cars, exclusive of engine and caboose, and when operating such train employs a full crew of six men. The usual train is less than 40 cars—averaging about 35—and is operated by a crew of five men. This daily train loads and unloads freight at any depot or siding where such freight is offered or to which it is destined.

The defendant is the district attorney of Klamath county and claims that the statute requires the plaintiff

to employ a full crew of six men on their usual daily freight train consisting of less than 40 cars and doing a local freight business.

The legislature, at its session in 1913, enacted a law entitled: "An Act relating to the safety of employees and passengers on railroads, and providing the number of men that will constitute a train crew." Section 2 of that act [Oregon Code 1930, § 62-1402] provides:

"It shall be unlawful for any person, corporation, company or officer of court operating any steam railroad or railway in the State of Oregon, and engaged as a common carrier in the transportation of freight or passengers to operate over its road or any part thereof in excess of fifteen continuous miles, or suffer or permit to be run over the same outside of yard limits, any freight train consisting of forty or more cars, exclusive of locomotive and caboose, with less than a full train crew consisting of six men, to wit: One engineer, one fireman, one conductor, two brakemen and one flagman (such flagman to have had at least six months' experience in train service) ; *provided, however,* that all main line local freight trains shall have a full crew consisting of six men, to-wit: One engineer, one fireman, one conductor, two brakemen, and one flagman (such flagman to have had at least six months' experience in train service) ; provided further, that light engines operated outside of yard limits, will be provided with a full crew of three men, to-wit: One engineer, one fireman, and one pilot, but this provision is not to apply to helper engines within helper districts." General Laws of Oregon, 1913, Chapter 162, § 2.

This suit was brought for the purpose of obtaining an interpretation in the form of a declaratory judgment as to the meaning of the phrase "main line local freight trains", as used in said section two.

■ In construing a statute, we must follow as far as possible the intent of the legislature: Oregon Code 1930, § 9-215, § 14-1043. It is therefore necessary for us to

determine what that intent was. The title of the act defines its purpose as: "Relating to the safety of employees and passengers on railroads, * * *". It prescribes that no freight train of more than 40 cars may be operated on any railroad within the state without a full crew of six men consisting of an engineer, fireman, conductor, two brakemen, and a flagman. It further provides that all "main line local freight trains" shall have a similar crew. A "local freight train" is one which stops at any siding or depot and loads or unloads freight as differentiated from one which unloads or loads freight at certain designated stops: *Arizona Eastern Railroad Company v. State,* 29 Ariz. 446 (242 P. 870). The train operated over plaintiff's railroad would thus appear to be a local freight train. It picks up freight where offered and discharges it at any siding or depot on its line, designated by the shipper, in carload lots or less than carload lots.

The only question remaining is whether the line in question is a *main line* within the meaning of the statute.

Funk & Wagnalls New Standard Dictionary defines the meaning of "main", when used as an adjective, as: "1. First or chief in size, rank, importance, strength, extent, etc.; principal, chief, leading; as, the *main* building."

The Encyclopaedia Brittanica, 11th Edition, defines "main": "The word is more common as a substantival elliptical use of the adjective, which usually has the sense of principal or chief in size, strength, importance, etc."

The Oxford English Dictionary in speaking of the adjective "main" says: "b. Chief or principal in permanent relation to others of the same kind or group. In many collocations, e. g. *main drain, road, street,*

*sewer, pipe, stream, root, line,* (of a railway), sometimes written with a hyphen.''

Webster's New International Dictionary defines the word "main" as: "7. Principal; chief; first in size, rank, importance, etc., as the main line of a railroad; * * *''

It thus appears that the word "main" is used, and is frequently used in connection with many different things.

In the case of *Diebold v. Kentucky Traction Company,* 117 Ky. 146 (77 S. W. 674, 111 Am. St. Rep. 230, 4 Ann. Cas. 445, 63 L. R. A. 637), "trunk line" and "main line" were defined as synonymous and interchangeable.

In *Chicago P. & St. L. R. Co. v. Jacksonville Railway Company,* 245 Ill. 155 (91 N. E. 1024), in interpreting a statute of Illinois, requiring one railroad to apply to the railroad and warehouse commission before constructing a line across the "main track" of another railroad company, the court there said, in deciding whether the track was "main track", that:

"The words 'main track', used in the statute of 1907, are not technical words. There is nothing to indicate that these words were used in any other than their popular and well understood meaning. The adjective 'main' describes the track, and is used in the sense of principal, chief, leading, or most important. * * * All of the witnesses experienced in railroading testified that by 'main track' is meant the main artery for the movement of traffic between any two points. Applying this definition here it cannot be said that track No. 26 is the main artery between any two points.''

22 R. C. L. 744 defines a "trunk railway":

"A 'trunk railway' is a commercial railway connecting towns, cities, counties or other points within the state or in different states, which has the legal

capacity, under its charter or the general law, of constructing, purchasing and operating branch lines or feeders connecting with its main stem or trunk, the main or trunk line bearing the same relation to its branches that the trunk of a tree bears to its branches, or the main stream of a river to its tributaries.'' [Citing *Diebold v. Kentucky Traction Company, supra.*]

■ In construing a statute, the court must, as far as possible, give effect to the intent of the legislature. In determining the proper construction, which will carry out that intent, many questions must be taken into consideration, chief among which is: What mischief did the legislature intend to remedy?

It is apparent from the title of the act that its purpose was to safeguard the life and limb of the employees and passengers on trains. The legislature evidently deemed it necessary, in order to accomplish this purpose, that when local freight trains were operating on main lines an additional flagman would be required to prevent a collision between the train on which he was working and another train travelling in the same direction. The evidence in this case shows that to be the chief function of the extra flagman. If, as in the instant case, there is only one train a day operating on the line in any direction at any given time, the employment of an additional flagman to protect against a rear-end collision is a wholly useless measure of precaution.

The statute was not enacted to discriminate between large railroad companies operating trains on a ''trunk'', ''arterial'' or ''main'' line, with many branches constructed and operated therewith, and the small railroad company with only one line, which, if the words ''main line'' be taken in their literal sense, would have a ''main line'' and any local freight train

operating thereon would be, in a sense, a "main line local freight train", even though only one train per day ran in any one direction at any given time.

But the statute was enacted to provide safety to the employees and passengers on trains, and it should not be interpreted so as to arrive at an absurd conclusion that would inflict hardship and injustice: *Sullivan v. Mountain States Power Company,* 139 Or. 282 (9 P. (2d) 1038).

In the case of *Holy Trinity Church v. United States,* 143 U. S. 457 (36 L. Ed. 226, 12 S. Ct. 511), the rule that an offense may be within the letter of the statute, and not within its spirit, is so well enunciated that we quote extensively therefrom:

"It is a familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers. This has been often asserted, and the reports are full of cases illustrating its application. This is not the substitution of the will of the judge for that of the legislator, for frequently words of general meaning are used in a statute, words broad enough to include an act in question, and yet a consideration of the whole legislation, or of the circumstances surrounding its enactment, or of the absurd results which follow from giving such broad meaning to the words, makes it unreasonable to believe that the legislator intended to include the particular act. As said in *Plowden,* 205: 'From which cases, it appears that the sages of the law heretofore have construed statutes quite contrary to the letter in some appearance, and those statutes which comprehend all things in the letter they have expounded to extend to but some things, and those which generally prohibit all people from doing such an act they have interpreted to permit some people to do it, and those which include every person in the letter, they have adjudged to reach some persons only, which expositions have always been founded upon the

intent of the legislature, which they have collected sometimes by considering the cause and necessity of making the act, sometimes by comparing one part of the act with another, and sometimes by foreign circumstances.' ''

■ The legislature had in mind all the railroad lines in the state of Oregon and not the lines belonging to any particular railroad company.

A "main line" within the meaning of the act (Oregon Code 1930, § 62-1401, et seq.) would be a line which would develop sufficient traffic, either freight or passenger, to necessitate more than one train being operated in the same or opposite directions at any one time within the division terminals.

A line of railroad may at certain times develop sufficient traffic to be a "main line" within the meaning of the act, and at those times must comply with the provisions of the statute requiring a full crew on its local freight trains.

The decree of the circuit court will be modified and the cause remanded with instructions to enter a decree not inconsistent herewith. Neither party will recover costs.

It is so ordered.