Argued at Pendleton October 28; affirmed December 30, 1941

# UNION PACIFIC RAILROAD CO. *v.*
# ANDERSON ET AL.
### (120 P. (2d) 578)

688

Before Kelly, Chief Justice, and Belt, Bailey, Lusk, Rand and Brand, Associate Justices.

*Robert F. Maguire*, of Portland (Roy F. Shields and Arthur C. Spencer, Jr., both of Portland, and F. L. Phipps, of The Dalles, on the brief), for plaintiff.

*Sam Van Vactor*, of The Dalles (Brown & Van Vactor, of The Dalles, on the brief), for defendants W. E. Regan and T. J. Carson.

*Rex Kimmell*, of Salem (I. H. Van Winkle, of Salem, and C. T. Godwin, of Baker, on the brief), for defendants I. H. Van Winkle and C. T. Godwin.

The plaintiff, Union Pacific Railroad Company, a corporation, brought this suit for a declaratory decree determining certain controversies which have arisen between it and the defendants respecting the construction and application of the Oregon Full Crew Law: General Laws of Oregon 1913, Ch. 162, 8 O. C. L. A., §§ 113-601 *et seq.* The defendants are the district attorneys for Union county, Malheur county and Baker county, respectively; the attorney general of the state; the chairman of the Oregon State Legislative Committee of the Order of Railway Conductors; and the state legislative representative of the Brotherhood of Railroad Trainmen for the State of Oregon.

The case, as it comes to us, has to do solely with § 2 of the Act (8 O. C. L. A. § 113-602), which reads as follows:

"It shall be unlawful for any person, corporation, company or officer of court operating any steam railroad or railway in the state of Oregon, and engaged as a common carrier in the transportation of freight or passengers to operate over its road or any part thereof in excess of fifteen continuous miles, or suffer or permit to be run over the same outside of yard limits, any freight train consisting of forty or more cars, exclusive of locomotive and caboose, with less than a full train crew consisting of six men, to wit: One engineer, one fireman, one conductor, two brakemen and one flagman (such flagman to have had at least six months' experience in train service); provided, however, that all main line local freight trains shall have a full crew consisting of six men, to wit: One engineer, one fireman, one conductor, two brakemen, and one flagman (such flagman to have had at least six months' experience in train service); provided further, that light engines operated outside of yard limits, will be provided with a full crew of three men, to wit: One engi-

neer, one fireman, and one pilot, but this provision is not to apply to helper engines within helper districts.''

The Union Pacific as lessee operates certain lines of railroad in this state and from here through Idaho to the East. A main line, owned by the Oregon-Washington Railroad and Navigation Company, extends from Portland to Huntington, Oregon, which is distant 2.5 miles from the Idaho boundary. In so far as operation and management are concerned, this line, with its branches, is a separate unit of the Union Pacific and operated by it as a part of its northwestern district. A continuation of this main line, owned by the Oregon Short Line Railroad Company, extends from Huntington easterly through Glenn's Ferry, Idaho. This line, with its branches, is likewise a separate unit of the Union Pacific and operated by it as a part of its south central district. The Oregon Short Line road, after leaving Oregon, runs 36.28 miles within the state of Idaho to a point near Ontario, where it again enters Oregon and continues in this state to Nyssa, where it again leaves this state and continues easterly through the state of Idaho. There are but 15.02 miles of track in Oregon on this line—2.5 miles between Huntington and the Idaho boundary line and 12.52 miles from the vicinity of Ontario to Nyssa. Of the foregoing track 6.69 miles are within yard limits.

The plaintiff further operates as lessee two so-called branch lines. One, owned by the O. W. R. & N. and known as the Joseph Branch, extends from La Grande in Union county, Oregon, to Joseph in Wallowa county, Oregon, a distance by railroad of 83.8 miles. The other, owned by the Oregon Short Line, and known as the Burns Branch, extends from Ontario in Malheur

county, Oregon, to Burns in Harney county, Oregon, a distance by railroad of 156.8 miles.

The foregoing are the only lines of railroad involved in this case.

The questions for decision, as made by the pleadings and the evidence, may be thus broadly stated:

First: Does the requirement of the statute that all freight trains consisting of forty or more cars, exclusive of locomotive and caboose, shall be manned by a full crew, apply to the plaintiff's operations east of Huntington? As to this, the plaintiff contends that the statute does not apply because it does not operate any freight trains over that line in excess of fifteen continuous miles in this state, while the defendants say that the mileage in Idaho must be considered in determining whether the operation is within the statutory classification, and that, so considered, the operation in question is in excess of fifteen continuous miles, exclusive of yard limits, and the statute, therefore, applies.

Second: Does the proviso, "that all main line local freight trains shall have a full crew", apply irrespective of the length of the operation in Oregon, or is this proviso affected by the fifteen continuous miles clause? As to this the defendants contend that certain freight trains operated by the plaintiff between Huntington, Oregon, and Nampa, Idaho, and classified by the plaintiff as "through" freight trains are in fact main line "local" freight trains, and as such, by force of the proviso, subject to the requirements of § 2 regardless of the number of cars in a train and, as well, of the distance run in Oregon. These operations are designated by plaintiff as "Assembling Operations East of Huntington". The plaintiff says, first, that

the trains in question are not "local" but "through" trains as they are classified by it; but, if it be assumed that they are local trains, the proviso does not bring them within the embrace of the law, because the fifteen continuous miles provision affects the proviso and these trains are not operated in excess of fifteen continuous miles in Oregon. The plaintiff concedes, however, that where the proviso is applicable the number of cars in a train becomes immaterial.

Third: Are the trains referred to under Second, *supra*, "local" or "through" trains? Decision of this question becomes unnecessary if it be determined that the fifteen continuous miles provision refers solely to operations within this state and affects the proviso.

Fourth: Are the Joseph and Burns lines "branch" lines, as the plaintiff designates them, or are they, in point of law, "main" lines, as the defendants assert, thus bringing within the embrace of the statute certain admittedly local freight train operations on those lines?

Upon the first question the circuit court by its decree held that the fifteen continuous miles provision does not refer to an operation exclusively within this state; upon the second, that the proviso is not affected by the fifteen continuous miles provision; upon the third, that the trains in controversy are main line local freight trains and, since they are operated in excess of fifteen continuous miles in this state and Idaho, they are subject to the law; and upon the fourth question, that the lines in question are branch lines and local freight trains operated over them are, therefore, exempt from the law.

Both sides have appealed.

LUSK, J. *First. Construction of the "fifteen continuous miles" provision.*

■ We are aware of no principle of statutory construction under which the court can say that the legislature intended that a railroad operation outside of this state should be added to one within the state in order to subject to the provisions of the act the freight operations of the plaintiff over the road of the Oregon Short Line east of Huntington. It will be remembered from the statement above that that line is not continuous for more than fifteen miles in this state, but is broken up into two parts—one 2.5 miles in length, and the other 12.52 miles in length, with intervening mileage in Idaho. The defendants argue that had the legislature intended to restrict the prohibition of the statute to fifteen continuous miles in Oregon it would have expressed that intention by appropriate language—a thing, it is said, easy to have been done. Any other construction, it is said, would violate the command of 1 O. C. L. A., § 2-216, reading:

"In the construction of a statute or instrument, the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted, or to omit what has been inserted * * * "

■■ But we should have thought it far more likely that the legislature would have expressed in unmistakable terms the intention attributed to it by the defendants had that been in the legislative mind. The purpose of the act, as indicated by its title, is to protect the safety of employes and passengers on railroads, and presumptively at least the legislature was thinking about the dangers incident to railroad operations in this and not in adjoining states. We do not take the view urged

on us by the plaintiff that there would arise grave doubt of the constitutionality of the law if it were construed as the defendants would have us construe it. It would not for that reason, we think, become extraterritorial legislation. The legislature might constitutionally identify railroads to be regulated in this state by reference to lines of railroad outside this state, and it would not thereby be guilty of extraterritorial legislation. But this is not what the legislature did, and therein lies the difference between this case and the case mainly relied on by the defendants—namely, *Kansas City Southern Railway Co. v. State*, 116 Ark. 455, 174 S. W. 223. There the statute—also a full crew law—provided that the act should "not apply to any railroad company * * * operating any line of railroad whose line or lines are less than fifty miles in length", and the court, construing the statute, held that the classification included mileage outside as well as within the state. This was the natural interpretation of the words of the act. The statute describes the type of railroad to which it was to apply, and no one could reasonably say that the description does not fit a railroad with fifty or more miles of line, whether or not a portion of that mileage is outside the state. But here the act makes it "unlawful for any * * * corporation * * * to operate over its road or any part thereof in excess of fifteen continuous miles * * * any freight train consisting of forty or more cars, etc." with less than a full crew. The statute is not made applicable to railroads having in excess of fifteen continuous miles of line, but in direct terms regulates the operation, which necessarily must be the operation within the state of Oregon.

■ So to hold does not require the insertion in the statute of "what has been omitted", because a law enacted by the Oregon legislature necessarily applies only to a subject within its jurisdiction, and the words, "in Oregon", if not expressed are necessarily implied; whereas the construction contended for by the defendants could not be adopted without reading into the statute language not found there to convey the idea that the length of an operation outside the state is to be taken into consideration in applying the regulation.

■ It may be true, as counsel for the defendants assert, that application of the statute to the line of railroad in question would serve to promote the expressed statutory purpose. But the court is not authorized to extend the language of the law beyond its natural meaning to accomplish salutary ends, for that would be to legislate and not to construe.

■ The defendants further contend that this provision, properly construed, prohibits all operations of freight trains consisting of forty or more freight cars· outside of yard limits without a full crew, regardless of the length of the operation. In other words, they say that the "fifteen continuous miles" provision has nothing to do with the running of trains outside of yard limits. They argue that the statute first makes it unlawful to operate the class of trains in question in excess of "fifteen continuous miles" without a full crew, and next makes it unlawful "to suffer or permit" any such train "to be run over its road outside of yard limits" without a full crew. Thus, they would have the statute construed as though it read "it shall be unlawful to operate certain trains within yard limits in excess of fifteen continuous miles without a full crew, or to suffer

or permit the running of such trains outside of yard limits for any distance whatever without a full crew''. The legislative purpose, we are told, was to prohibit extension of the yard limits beyond fifteen miles.

We think this position is untenable. The legislature intended to prohibit a railroad company from operating over its road, or suffering or permitting to be run over its road in excess of fifteen continuous miles outside of yard limits, any freight train, etc. No logical reason has been, or, as we think, can be, suggested for making it unlawful in the one instance to *operate* and in the other to *suffer* or *permit* an operation. We think that all three italicized words were used to prevent evasion of a single command of the law—the requirement of full crews on forty-car trains operated or suffered or permitted to be operated in excess of fifteen continuous miles outside of yard limits in this state— and that the phrases, ''in excess of fifteen continuous miles'' and ''outside of yard limits'', are to be read together and as modifying and limiting the operations denounced by the statute.

If, as asserted, the legislature adopted this means of prohibiting the extension of yard limits beyond fifteen miles, it would seem that that body was at great pains to conceal its intention behind a veil of almost impenetrable language.

It must be conceded that the statute in this regard is not a workmanlike piece of legislative draftsmanship. Its meaning, however, as well as the occasion for the awkward disposition of phrases, becomes clear enough when we consider the history of the statute. Originally there was introduced Senate Bill No. 214 (Senate Journal 1913, p. 283), § 2 of which would have made it unlawful for any railroad company ''to operate

over its road, or any part thereof, or suffer or permit to be run over its road outside of the yard limits, any freight train consisting of twenty-five or more cars, etc.'' Obviously, this was a prohibition upon the operation, or suffering or permitting the operation, of the designated class of trains anywhere outside of yard limits without a full crew, and irrespective of the distance run. Evidently, also, it was in the mind of those who prepared and introduced the measure that there were reasons for requiring full crews outside of yard limits which had no application to the conditions of railroad operations within yard limits. This view is fully supported by the evidence in this case, which shows without dispute that the safety of train men working in the yards is protected by a rule which requires a train coming into the yard limits to go at a speed which will enable it to stop within the distance the main track can be seen or is known to be clear. The original bill, moreover, contained three other sections besides § 2 requiring full crews for various classes of trains, and each of which extended to operations within yard limits the same exemption from their application as did § 2.

On recommendation of the Committee on Railroads to which Senate Bill No. 214 had been referred, it was laid on the table, and Senate Bill No. 331, which became the present Full Crew Law, was substituted in the place of the original bill (Senate Journal 1913, p. 487). Comparing § 2 of Senate Bill No. 214 with its counterpart in the statute as enacted, it is at once seen that the purpose was to accomplish two principal changes: first, to increase the number of cars in trains subject to the regulation from twenty-five to forty, and, second, to limit the regulation to an operation of more than

fifteen continuous miles. Manifestly, it was not intended to make the regulation broader and more inclusive than as provided in the original bill. The draftsman, however, neglected, in reframing § 2, to place the phrase beginning with the words "suffer or permit" where it belongs—namely, before the phrase "in excess of fifteen continuous miles" instead of after that phrase. This bad job of sentence construction will not be permitted to frustrate the plain intention of the legislature—an intention given emphasis by the concluding provision of § 2, which excludes operations within yard limits from the requirement of full crews for light engines.

*Second: Does the fifteen continuous miles clause affect the proviso?*

The portion of the statute which we have been considering is followed by this language:

"*Provided, however,* that all main line local freight trains shall have a full crew consisting of six men, etc.*"*

■ The plaintiff, while contending that the trains included in its so-called "assembly operations" are not "local" freight trains and therefore not affected by the proviso, asserts that main line local freight trains are governed by the fifteen continuous miles provision, and as the trains in question do not operate in excess of fifteen continuous miles in Oregon they are in any event exempt from the regulation. This is a bald assertion of counsel, without reason or authority to support it. The court does not concur in this view.

"The office of a proviso, generally, is either to except something from the enacting clause, to restrain its generality, or to exclude some possible ground of misinterpretation of it, as extending to cases not intended by the legislature to be brought within its purview."

*Minis v. United States*, 15 Pet. 423, 10 L. ed. 791, cited in *Meyers v. Pacific States Lumber Co.*, 122 Or. 315, 321, 259 P. 203.

■ But this is not always the case, and a proviso may sometimes be construed as extending rather than limiting legislation. Each statute "must depend upon its own terms, and a proviso will be given such construction as is consistent with the legislation under construction." *American Express Co. v. United States*, 212 U. S. 522, 53 L. ed. 635, 29 S. Ct. 315. See, also, *Georgia R. & Banking Co. v. Smith*, 128 U. S. 174, 32 L. ed. 377, 9 S. Ct. 47; *Interstate Commerce Commission v. Baird*, 194 U. S. 25, 36, 37, 48 L. ed. 860, 865, 866, 24 S. Ct. 563; 25 R. C. L. Statutes 985, § 231.

■ Strictly speaking, the clause under consideration is not a proviso at all, since it serves neither to except something from the enacting clause, to restrain its generality, nor to exclude some possible ground of misinterpretation of it. On the contrary, this clause extends the legislation beyond the scope and purview of the enacting clause, and the word "provided", as in *Georgia R. and Banking Co. v. Smith*, supra, has "no greater signification than would be attached to the conjunction 'but' or 'and' in the same place". We cannot ignore the force of the word "all", and the plain meaning of the clause is, that, irrespective of the number of cars in the train or of the number of miles operated, all main line local freight trains are required to be manned with a full crew.

*Third: Plaintiff's assembling operations east of Huntington.*

It becomes necessary, therefore, to determine whether the trains included in the so-called assembling operations are through freight trains or local freight

trains within the meaning of the statute. It is conceded that they are operated on the plaintiff's main line, and this being so, if they are local trains, they must be manned with a full crew.

They are classified by the plaintiff as through trains and have only five-men crews. There are two regular east-bound trains numbered respectively 256 and 260, and two regular west-bound trains numbered respectively 255 and 265. Separate sections are run as traffic demands make them necessary, and these are numbered "1st 256", "2nd 256", etc. They move on a fast schedule, in some instances as fast as a passenger train, though they do not always maintain these schedules because of local work required to be done en route. The east-bound trains start from Huntington with freight that originates around Seattle, Tacoma, Portland, and other points west of Huntington and destined for Council Bluffs, Omaha, Chicago, and other eastern points. As explained by F. H. Knickerbocker, general manager of the South Central District of the Union Pacific, they handle "high class manifest freight mostly going to primary markets from producing centers and operating on prescribed schedules on fast time". It was conceded by L. F. Ingersoll, a railroad conductor for the plaintiff who testified for the defendants, that seventy-five to eighty per cent of the east-bound loads consist of Idaho products which are transported to the Middle West and the East; but there is a certain amount of movement of "short loads", that is, cars picked up en route and set out at stations before reaching the terminal point of the division at Glenns Ferry, and this is ordinarily done pursuant to orders received en route. The west-bound trains carry some products which have originated in the Middle

West or East, but they are composed mostly of empty cars brought to transport Oregon and Idaho products to Middle Western and Eastern centers.

It is the so-called local work done by these trains between Huntington, Oregon, and Glenns Ferry, Idaho, that has given rise to the present controversy.

The general character of this work is thus explained in the cross-examination of Mr. Knickerbocker:

"Q Will you state just what this crew on train number 260, after it leaves Huntington, does with respect to this matter of setting (*sic*) or taking on cars to Nampa or Glenns Ferry?

"A Well, they usually start out of Huntington with the business that has been delivered at Huntington by the Northwestern district, that is, this territory west of Huntington, and then as it proceeds eastward it may stop at Weiser, for example, and pick up any business, perishable or livestock, or lumber, that is brought in from what is known as the New Meadows branch, which runs from Weiser up to New Meadows; and the next stop, in all probability, would be at Payette, also a heavy produce-loading point where there is a branch from Emmet into Payette.

"Q What does it do at Payette?

"A It probably picks up prunes, perhaps some livestock, fruits and vegetables.

"Q In other words, it does not stop for Payette unless it has some local work to do, is that correct?

"A It would not stop at Payette generally unless it had some other freight to pick up for points away east of this railroad.

"Q Does it ever drop off any cars at Payette?

"A Not generally on the east-bound trip. The distribution of the empties is handled more by the west-bound trains than the east-bound. We are speaking of a through freight train operating from Huntington eastward.

"Q I am speaking particularly of No. 260.

"A Yes. Well, that is on there largely for convenient train dispatching and so on.

"Q This No. 260, does that stop and drop or take on cars at Nyssa?

"A Generally it stops, I would say, more to pick up cars and pick up loads going east.

"Q Can you tell at just what definite stops, or stations, No. 260 will do local work such as picking up or dropping of cars?

"A There is no local work that is done by these through freight trains beyond either the picking up of east-bound loads or setting out empties as the trains go west, and they would not be required to stop to pick up loads at any place unless there were loads to move, and, of course, that fluctuates. Probably during the month of August and the forepart of September practically every east-bound through freight train might be required to stop at several points en route in order to pick up east-bound loads."

Knickerbocker further testified:

"These trains don't do any picking up or setting out, except generally what is characterized as incident to their own train. If one of these east-bound trains, say second or third No. 260, stops at Weiser and Payette to pick up, they are taking on loads that are going on through to the end of the district, or Glenns Ferry, and still beyond that. In other words, I want to try to make the distinction, if I can, that these trains are not generally doing a class of local work; for instance, they would not pick up at Weiser, or Payette, or Ontario, or Nyssa, or Caldwell, any cars, what we call 'shorts' loads; generally they pick up through loads going on east of the Missouri river, Chicago, or Kansas City, and so on."

These trains do no loading or unloading of less than carload lots. They are required, however, as indicated by the quoted testimony, to make "pick ups" and "set

outs". A pick up is defined as the movement by which cars are added to the train en route for delivery at another station, and a set out as the movement by which a car is taken out of a train en route and placed on a side track without "spotting" it. To spot a car is to place it at the precise spot where it is to be loaded or unloaded, such as a freight house, a team track, or a shipper's warehouse. Knickerbocker explained "a mere setting out might be just to shove the cars in on the first clear track without any attempt to spot them at a definite location."

Switching is a necessary incident of picking up and setting out, but a distinction is made between what is called "station switching" and "switching incident to the movement of the train handled", the former being peculiarly the job of a local train crew. Thus, in station switching the crew spots cars for loading or unloading at a freight station team track or shipper's warehouse; it spots cars not a part of its own train which had been set out but not previously spotted or will line up cars for east and west-bound traffic. It is referred to by the witness L. F. Ingersoll as "turning the town over". Very little station switching is done by the crews of the trains in controversy. Most of their switching is merely incidental to handling their own trains.

Mr. Ingersoll recited in detail the work done incident to one trip of a west-bound train from Glenns Ferry to Huntington, on which a number of short loads were moved, making it necessary to stop at various points en route, set out and pick up cars, and do the switching incident to such operations. He testified that at least fifty per cent of his work was local work and that was true of every so-called through freight in his

district; and gave it as his opinion that a train which originated in New York or New England bound for Idaho, would be through traffic when it started, but when it reached Glenns Ferry containing loads for points within his district it became local traffic; and, similarly, that freight coming from Portland bound for his district is not through traffic if, when received at Huntington, it has cars destined for Ontario and other places within the district.

The plaintiff has only one train operating east of Huntington which it designates as a local freight train, or, as it is called, an "assigned local" because the crews are assigned to it. This train runs between Huntington and Nampa, Idaho, a distance of 82.2 miles. It is not scheduled on the time table. It picks up, loads, and unloads freight anywhere along the line, handles "short loads" for way points, and does a daily job of switching at stations between Huntington and Nampa. It aids in the plaintiff's so-called assembly operations by moving cars for east-bound shipment to Nampa, where they are "blocked", that is, cars destined for the same point are switched to one place in the train so as to save switching upon delivery of the freight to the connecting lines.

Out of this situation came what is known as the plaintiff's conversion rule. Crews of local freight trains are paid higher wages than crews of through trains. Local work was being done by the men on trains classified by the plaintiff as through trains, and the rule was established in order to compensate the men for certain of this local work at local train rates of pay. The rule follows:

"LOCAL RATES TO POOL FREIGHT CREWS: Crews in through freight service, doing local work,

viz., loading and/or unloading a total of 2500 pounds or more of merchandise, loading and/or unloading 5 or more cars of livestock, picking up and/or setting out at three or more stations, (exclusive of cases on a straightaway trip where the entire train is set out or picked up on or from a single track), or where general switching (cars to be picked up and/or set out are in seven or more places) is necessary at any station in order to get pick-ups or make set-outs, the placing to spot of car or cars that were not a part of the train of the handling crew nor incidental to the respotting of cars in making pick-up or set-outs, from their train, or where required to load stock or switch out cars to be picked up by another crew, will be paid local rates for the trip.''

The foregoing, we believe, fairly summarizes the evidence as to the character of the train operations under consideration. Whether these trains are to be deemed local or through trains within the meaning of the Full Crew Law is a question of no little difficulty. In *Oregon, C. & E. Railway Co. v. Blackmer*, 154 Or. 388, 391, 59 P. (2d) 694, this court said:

''A 'local freight train' is one which stops at any siding or depot and loads or unloads freight as differentiated from one which unloads or loads freight at certain designated stops: Arizona Eastern Railroad Company v. State, 29 Ariz. 446, 242 P. 870. The train operated over plaintiff's railroad would thus appear to be a local freight train. It picks up freight where offered and discharges it at any siding or depot on its lines, designated by the shipper, in carload lots or less than carload lots.''

No doubt the crews of the trains in question at times do a portion of the work done by the crews of local trains, and to some extent the public is afforded a service similar to that rendered by local trains. But

these functions are merely incidental to the main purpose of the operation—the transportation of through freight from the Far West to Middle Western and Eastern points. To this the local service is subordinate and is apparently afforded for the most part on account of the necessity of moving perishable fruit and live-stock as expeditiously as possible. These trains do not, like the train in the O., C. & E. case, load and unload freight in less than carload lots, nor do they stop "at any siding or depot". Thus, for example, the testimony shows that loads for Arcadia or Nyssa are usually set out at Ontario, which is several miles north of those towns, and are later picked up and moved to their destination by the local following. The plaintiff's conversion rule is merely a recognition that the employes are entitled to receive local freight train rates of pay for such local work as they are called upon to do; it cannot of itself fix the character of the trains, which we think might well be described as through trains rendering some local service. It is true, as counsel for the defendants urge, that in applying the statute we should bear in mind the evils which it was enacted to remedy. We may assume that consideration of the dangers incident to switching lead to the differentiation which the legislature made between local and through trains, but it appears that most of the switching required is of the kind done by the crews of through trains—that is, it is incidental to the work of the train handled, and we would be on very uncertain ground were we to attempt to determine the application of the statute to particular trains by the standard of the degree of danger encountered by their crews.

■■■■ That there are persuasive arguments in support of the defendants' position may be conceded, but

there is one consideration which we think must be determinative in the solution of a doubtful and difficult question. Though the Full Crew law was enacted in 1913 it was not until 1931, eighteen years later, that the organizations of railway employes or their officers claimed that the trains in controversy were through trains and were being operated in violation of law. The law was passed at the insistence of these organizations, whose representatives are defendants in this suit, and it is not to be assumed that they have been wanting in vigilance to protect all the rights of the employes which the enactment was intended to secure. This court in *Thielke v. Albee*, 79 Or. 48, 53, 153 P. 793, in construing a provision of the state constitution, referred to the fact that for more than nine years the state legislature, the people of the city of Portland and those of many other municipalities, had understood the provision in a certain way, and applied the familiar rule of statutory construction that in case of doubt or ambiguity "contemporaneous construction of constitutional or legislative provisions and long acquiescence in a particular interpretation are very persuasive in leading the courts to adopt the same construction". Here the construction of the law, or perhaps it might be more accurate to say the application of a provision of the law to a particular state of facts, has been by those who are governed by its provisions in a special and immediate way, and on the part of the defendants there has been acquiescence for this period in the position assumed by the plaintiff. In that posture of affairs we deem it proper to apply the rule announced in *Himrod Coal Co. v. Stevens*, 104 Ill. App. 639, 644, as follows:

"Where a statute regulating the manner of conducting a certain industry is ambiguous or indefinite,

courts will receive as an aid to proper interpretation the construction which practical persons engaged in the industry generally place upon it."

■ We conclude, therefore, that the trains in question have been properly classified by the plaintiff as through trains and are not to be deemed local freight trains under the provisions of the Full Crew law.

*Fourth. Burns and Joseph lines.*

The defendants insist that these are main lines and that certain local freight trains, consisting of less than forty cars and manned with five-men crews, are being operated over them in violation of the Full Crew law. Their contention is based on the fact that on each line two or more trains are operated in the same direction or opposite directions at one time. In these circumstances they say that debate is foreclosed by the following language from the opinion in *O., C. & E. Railway Co. v. Blackmer,* supra:

"A 'main line' within the meaning of the act (Oregon Code 1930, § 62-1401, et seq.) would be a line which would develop sufficient traffic, either freight or passenger, to necessitate more than one train being operated in the same or opposite directions at any one time within the division terminals.

"A line of railroad may at certain times develop sufficient traffic to be a 'main line' within the meaning of the act, and at those times must comply with the provisions of the statute requiring a full crew on its local freight trains."

■ The quoted language was *obiter.* The O., C. & E. case was concerned with a short line of railroad extending from Klamath Falls about sixty-five miles to the town of Bly, all in Klamath county, Oregon. The road was jointly controlled by the Southern Pacific

Company and the Great Northern Railway Company. The court held that the road was a branch line, giving as the reason for its decision the fact that only one train a day was operated over its tracks, and therefore the mischief at which the Full Crew law aims was not present. Having so decided, the court went on to use the language quoted, which obviously was unnecessary and not pertinent to the issue or the facts. The decision was correct and the reasoning in support of it sound, but it is a *non sequitur* to say that a railroad held to be a branch line because only one train a day is operated over it, is transformed into a main line by an increase in the volume of traffic which necessitates an increase in the number of trains. Being dictum, the statement does not bind the court, and we are of the opinion that it should not be followed.

We think that the criterion thus announced will not bear the test of analysis because the words "main line" and "branch lines", as applied to railroads, are in common use, have a definite and well understood meaning, and are to be applied and given effect accordingly: 59 C. J. (Statutes) 975, § 577; *Cary v. Metropolitan Insurance Co.*, 141 Or. 388, 392, 17 P. (2d) 1111. This being so, for the court to make the application of the words "main line" and "local lines" to a particular railroad dependent upon its own view or its judgment as to the legislature's view of the expediency or desirability of extending the law to a subject not embraced by its terms, would be to exercise a legislative, not a judicial, function.

The commonly understood meaning of the words "main line" of a railroad is the principal line, and the branches are the feeder lines like the tributaries of a river. The court so stated in the O., C. & E. case,

quoting dictionary definitions to that effect. It also quoted from 22 R. C. L. 744 the following:

"A 'trunk railway' is a commercial railway connecting towns, cities, counties or other points within the state or in different states, which has the legal capacity, under its charter or the general law, of constructing, purchasing and operating branch lines or feeders connecting with its main stem or trunk, the main or trunk line bearing the same relation to its branches that the trunk of a tree bears to its branches, or the main stream of a river to its tributaries."

To the same effect is *Baltimore & Ohio R. Co. v. Waters*, 105 Md. 396, 66 Atl. 685, 12 L. R. A. (N. S.) 326, where the court said that a "lateral road" (which was treated as synonymous with a "branch line") was "nothing more nor less than an offshoot from the main line or stem", and approved the following definition from *State v. United New Jersey R. and Canal Co.*, 43 N. J. L. 110:

"It denotes a road connected, indeed, with the main line, but not a mere incident of it, not constructed simply to facilitate the business of the chief railway, but designed to have a business of its own, for the transportation of persons or property to and from places not reached by the principal route."

See, also, *Blanton v. Richmond Railroad*, 86 Va. 618, 10 S. E. 925; *St. Louis Railway Co. v. Petty*, 57 Ark. 359, 21 S. W. 884, 20 L. R. A. 434.

Numerous legislative enactments, both federal and state, use the terms main line and branch line without defining them. Among these we may refer to the Clayton Act of October 15, 1934, Ch. 323, § 7, 15 U. S. C. A., § 18, relating to combinations and monopolies in restraint of trade; the Congressional Act of September 29, 1890, Ch. 1040, § 6, 43 U. S. C. A., § 907, relating to

the restoration to the public domain by railroads of unearned land grants; § 113-201, O. C. L. A., Subds. 13, 14 and 15, requiring annual reports by railway corporations to the secretary of state; § 113-403, O. C. L. A., regulating the construction by railways of branch lines, side lines, and extensions of the main line; § 110-515, O. C. L. A., pertaining to the assessment of railroad properties and providing for the assessment and valuation of their main lines and branch lines. Obviously both the Congress of the United States and the legislature of this state, in enacting these laws, proceeded upon the assumption that the meaning of the words in question was definite and commonly understood, and there is no reason to suppose that they were used in any other than their ordinary sense in the Oregon Full Crew law. See, *Lasene v. Syvanen*, 123 Or. 615, 624, 257 P. 822, 263 P. 59. It would seem, moreover, that both the Public Utilities Commissioner of Oregon and the Oregon State Tax Commission, and also the Interstate Commerce Commission, have, over a long period of time, given administrative approval to the classification of main lines and branch lines established by the plaintiff here and by other railroads.

 The evidence in this case shows beyond any serious question—indeed, we think we may take judicial notice—that the main line of the Union Pacific Railroad Company extends from Portland easterly through Huntington and Ontario, Oregon. One of the lines here in controversy leaves the main line at La Grande and proceeds a distance of 83.8 miles to Joseph in Wallowa county. It is known as the Joseph Branch. The other leaves the main line at Ontario and runs for 156.8 miles to Burns in Harney county and is known as the Burns Branch. Under judicial definition and by common un-

derstanding they are but branches of the railroad's main line, and cannot be converted into main lines for the purpose of the Full Crew law by the fact that the traffic which they carry necessitates the operation of more than one train at a time over their tracks.

■ The proviso of § 2 refers to local freight trains on main lines only; branch lines are, therefore, impliedly excluded. Hence, the freight trains operated over the Joseph and Burns branch lines need not be manned with six-men crews unless they consist of forty or more cars exclusive of locomotive and caboose.

■ In addition to the questions which have been discussed the pleadings present a controversy as to whether a train, consisting of both passenger cars and freight cars operated on the Joseph Branch and designated by the plaintiff a "mixed" train, is to be deemed either a passenger or a freight train, the plaintiff alleging that it has no status under the Full Crew law; and a further controversy as to the status of a gasoline motor engine and trailer for transporting passengers operated on the Burns Branch. The circuit court did not settle either of these questions by its findings of fact and conclusions of law, and the decree does not mention them. The record fails to show that findings upon these issues were presented to the court. No complaint is now made because of the court's failure to pass upon them. No assignments of error are directed to them, and the only reference to either of them in any of the briefs is the statement in the defendants' brief that "it is assumed that there is no dispute about the gasoline motor engine and trailer being a passenger train because it is so designated" in the complaint. In this state of the record we are of the opinion that

neither of these questions is before us, and we decline to pass upon them.

The decree of the circuit court is reversed in so far as it determines that the plaintiff in its operations in Oregon must conform to the Full Crew law irrespective of the amount of the Oregon continuous mileage east of Huntington in Baker county, Oregon, and in so far as it determines that the trains, operated by the plaintiff in its assembling service and which the plaintiff has classified as through trains, are local freight trains within the meaning of the Full Crew law. Otherwise, the decree is affirmed. No costs or disbursements will be allowed.