Argued October 16, affirmed December 10, 1958

# CLOSTERMANN, Executor *v.* SCHMIDT et al
## ROGERS
### 332 P. 2d 1036

*Irwin A. Seibel,* Washington, D.C., argued the cause for appellant. With him on the brief were Dallas S. Townsend, Assistant Attorney General, Director, Office of Alien Property, Washington, D.C., C. E. Luckey, United States Attorney for the District of Oregon, Portland, Valentine C. Hammack, Special Assistant to the Attorney General, Washington, D.C., James D. Hill, Washington, D.C., and George B. Searls, Washington, D.C.

*A. G. Clostermann,* Portland, argued the cause for respondent Robert G. Clostermann. With him on the brief was Robert G. Clostermann, Portland. Catherine Zorn, Assistant Attorney General, Salem, argued the cause for respondent State Land Board of the State of Oregon. With her on the brief was Robert Y. Thornton, Attorney General, Salem.

Before LUSK, Presiding Justice, WARNER, SLOAN and O'CONNELL, Justices.

WARNER, J.

This is an appeal by the defendant Attorney General of the United States, acting in his capacity as the Alien Property Custodian, pursuant to the Trading with the Enemy Act (50 USC App § 1 et seq.), and to whom we will hereinafter refer as "the Custodian."

It has its origin in a proceeding for a declaratory judgment initiated by Robert G. Clostermann, as executor of the last will and testament of Friedrich Georg Gottlob Schmidt, to determine whether legal and actual reciprocity existed between the United States and Germany on the date of Schmidt's death, as required by § 61-107, OCLA (Oregon Laws 1937, ch 399, p 607). The resulting decree was in favor of the executor; that is, that there was no reciprocity existing as of April 24, 1945, between the two countries so as to entitle a German alien beneficiary to take a legacy of personal property provided by the Schmidt will.

The present defendant-respondents, Robert D. Holmes, Mark O. Hatfield and Sig Unander, are, respectively, the Governor, Secretary of State and State Treasurer of the state of Oregon, who, together comprise the State Land Board, and who were duly substituted in this matter for their respective predecessors in said offices, the original defendants, Douglas McKay, Earl T. Newbry and Walter J. Pearson. The State Land Board would be the recipient of decedent's property in the event of an escheat. That issue, however, is not before us.

The controlling statute, § 61-107,[1] OCLA, supra, which the court is called upon to construe, and hereinafter referred to as the reciprocity statute, reads as follows:

"The right of aliens not residing within the United States or its territories, to take personal property or the proceeds thereof in this state by descent or inheritance, is dependent in each case upon the existence of *a reciprocal right* upon the part of citizens of the United States to take per-

[1] § 61-107, OCLA, although amended by Oregon Laws 1951, ch 519, and as so amended, now known as ORS 111.070, was the law in effect on the date of Schmidt's death.

sonal property or the proceeds thereof in like manner *within the countries* of which said aliens are inhabitants or citizens, and upon the right of citizens of the United States to receive, by payment to them within the United States, or its territories, moneys originating from estates of persons dying within such *foreign countries*. In the event no heirs other than said aliens are found eligible to take such property, said property shall escheat to the state of Oregon, as provided by law in those cases where a person shall die intestate without heirs." (Emphasis ours.)

When Schmidt died, in Eugene, Oregon, he was a citizen of the United States and World War II was still in progress. The defendant Emmy Schmidt, his legatee, was a citizen of Germany, and at that time residing in Hof an der Saale, a community in West Bavaria, which lies about 15 miles west of the city of Asch. Hof had been officially taken by elements of the U. S. Third Army on April 15, 1945, nine days before the death of decedent-testator. The complete subjugation and surrender of Germany did not occur until May 8, 1945.

In September, 1947, and before the closing of the probate of the Schmidt estate, the Custodian issued a vesting order, purporting to vest the interest of Emmy Schmidt, if any, in the estate, as an enemy alien. But its effectiveness depends upon the existence of reciprocity between Germany and the United States as defined by § 61-107, OCLA, supra, as of April 24, 1945.

On September 18, 1944, General Eisenhower, as the Supreme Commander of the AEF, issued a proclamation to the German people outlining policies of the Allied Forces to be enforced in German areas occupied by the allied troops. This proclamation, among other

things, declared the intention of the allies to wipe out the "cruel, oppressive and discriminatory laws and institutions" created by Nazism. This intent was implemented by a series of Military Government Laws known as No. 1 and No. 2, likewise issued in September, 1944, and other military documents.

The Custodian takes the position that coincident with the investiture of Hof an der Saale by American troops on April 15, 1945, German laws of the Nazi regime restricting reciprocity as contemplated by § 61-107, OCLA, supra, were immediately repealed and all laws of a reciprocal nature relating to inheritance by aliens existing prior to the Nazi domination, were concurrently restored and were in effect in Hof and its immediate environs as of April 24, 1945.

■ This claim of the Custodian rests upon the Eisenhower proclamation above referred to and subsequent documents issued pursuant thereto. He also depends upon the testimony of Ernest J. Hill, the government's sole witness. Mr. Hill, prior to his admission as a member of the bar of California, in 1927, was a lawyer in and resident of Germany. At no time from 1941 to 1945 (the war period) was he in Germany, and he frankly disclaimed to speak as an expert in American Military Law. He thereby limits the value and scope of his testimony as an expert to his claim of knowledge as to what was the status of German reciprocity law in Hof as of April 24, 1945. Without a knowledge of American Military Law, he could not arrive at sound or safe conclusions respecting the construction of the Eisenhower proclamations and later military pronouncements implementing the same and their impact, if any, upon Hof and its environs as of April 15, 1945. We have no occasion to discredit his knowledge of German law as it existed prior to the incoming of the

Nazi government or thereafter up to April 15, 1945. In this respect, we find his views to some extent in accord with our holding in *In Re Estate of Krachler,* 199 Or 448, 263 P2d 769 (1953). But we cannot give the same weight to what he has to say concerning the impact of military pronouncements upon German law, when made prior to April 24, 1945.

Moreover, we are not persuaded that the military statements upon which the Custodian relies reach the matter of reciprocity. In our view, the matter and things held out to the Germans by the proclamation of September 18, 1944, and upon which the Custodian places his prime reliance, were prospective in accomplishment; that is, they were to be effective only upon German surrender. As we have noticed, that did not occur until May 8, 1945.

■ Until that date, our troops were in active forward movement as belligerents and their occupation of towns and communities such as Hof required no greater change in the application of foreign law in a given area invested by them than was necessary to the maintenance and safety of our forces and the immediate purposes of the war. 2 Oppenheim's International Law (7th ed), Lauterpacht 1952, 437 § 169. It is a conclusion consonant with the rules of our own military government and when such occupation, as at Hof, was at best only provisional until the time of the enemy surrender. U. S. Army Field Manual 27-10, Rules of Land Warfare, paras 275, 276. Such was the actual pattern followed by our armies according to Harold Zink, who was present in Germany as a military government staff officer during the critical period. Zink, American Military Government in Germany, p 57. See, also, the article in 32 Minn Law Rev 319, entitled "Some Observations on Military Occupa-

tion," by Col. Charles Fairman, Professor of Law and Political Science, Stanford University, and during the war Chief of International Law Division, Judge Advocate Section, Hq. ETO, November, 1944 to November, 1945. The record satisfies us that reciprocity did not exist in Germany as of the date of Mr. Schmidt's death.

But it is unnecessary for us to expand by further statement why, in our opinion, the Custodian's dependence upon the military documentation is untenable. Even if we assume for the sake of argument, and as the Custodian contends, that the capture of Hof by American troops two weeks prior to decedent's death gave rise to reciprocity of a kind in that limited area of German territory, it was, nevertheless, not of a kind or quality which would satisfy the standards established by § 61-107, OCLA, so as to entitle Emmy Schmidt to take the legacy provided by her cousin's will.

By the thrust which is given to the proposition of reciprocity arising in Hof by the presence of the American army, the Custodian presupposes that reciprocity within the statute may be forthcoming from a mere territorial "area," less than the whole of the country of which it was a part, and in contrast to an international entity in the metaphorical sense. He argues that since reciprocal treatment to American citizens is the statute's overriding theme, the Oregon legislature was not primarily preoccupied with the minutia inherent in the terms, "countries" or "foreign countries." If this is a sound argument, we ask: with whom was reciprocity to be had? Thus, the issue presented by the Custodian is whether the Oregon statute calls for reciprocity with Germany as a whole or is satisfied by reciprocity limited to any lesser area in Germany in which a foreign legatee may reside.

The kernel of the foregoing proposition unavoidably leads to a consideration of the dual expressions, "countries" and "foreign countries," as employed in the reciprocity statute.

■ In any discussion of the word, "countries," or its singular form, one must be aware of its general figurative acceptation in the workaday world. It more often serves to identify other objects, such as population, nation, state, government, possession and dominion. *United States v. The Recorder*, 27 Fed Cas 718, 721, No. 16, 129; 20 CJS 1299, Country.

In *Delany v. Moraitis*, 136 F2d 129, 130 (4th Cir 1943), an opinion by the late Judge John J. Parker, we learn that:

> "But a man's 'country' is more than the territory in which its people live. The term is used generally to indicate the state, the organization of social life which exercises sovereign power in behalf of the people." (Citing *U. S. v. The Recorder*, supra.)

But we here observe the danger in blind acceptance of any abstract definition. Because the word, "country," defies preciseness, its meaning varies by untold degrees with the context in which it is employed. The Supreme Court of the United States, speaking through Chief Justice Hughes, emphasizes the above caveat as follows:

> "The word 'country,' in the expression 'foreign country,' is ambiguous. It may be taken to mean foreign territory or a foreign government. In the sense of territory, it may embrace all the territory subject to a foreign sovereign power. When referring more particularly to a foreign government, *it may describe a foreign State in the international sense, that is, one that has the status of an international person with the rights and responsibilities under international law of a member of the family*

*of nations;* or it may mean a foreign government which has authority over a particular area or subject-matter, although not an international person but only a component part, or a political subdivision, of the larger international unit * * *." *Burnet v. Chicago Portrait Co.,* 285 US 1, 5-6, 52 S Ct 275, 76 L ed 587. (Emphasis ours.)

For a specific application of *"country"* to the context of a reciprocal inheritance statute which is similar to ours, we need turn solely to *In Re Nepogodin's Estate,* 134 Cal App2d 161, 285 P2d 672 (1955). In that case, the California court, at page 680, said with decisiveness:

"* * * we are of the opinion that *'country'* in Section 259, Probate Code [the California reciprocity statute which is a near counterpart of § 61-107, OCLA], *means state* and that so long as there is not stabilized secession of a part of a state the decision as to *reciprocity must be based on the conditions in the foreign state as a whole and not on temporary conditions in the specific locality or province of which the claimants are residents."* (Emphasis ours.)

■ In the instant Oregon statute, as well as in common parlance, we think the term, "countries," is used in its metaphorical sense to denote a national political person, such as a country with a relatively permanent form of government, system of laws and with membership in the family of nations. Not by the widest stretch of reasoning can it be said to pertain to a portion or area of a whole political entity as Hof an der Saale was to Nazi Germany on April 15, 1945, when occupied by U. S. troops before the German surrender.

■ The phrase, "foreign country," and its plural form, is similarly vexing and often elusive and confusing in meaning; but it does possess a common significance, the heart of which rests in the soluble

characteristic of "foreign sovereignty." In *United States v. Spelar,* 338 US 217, 219, 70 S Ct 10, 94 L ed 3 (1949), the court was required to give a definition to the words, "foreign country," as found in the phrase, "any claim arising in a foreign country," as used in the Federal Torts Claims Act. There the court met the problem with this statement:

> "We know of no more accurate phrase in common English usage than 'foreign country' to denote territory subject to the sovereignty of another nation."

Earlier, in *DeLima v. Bidwell,* 182 US 1, 21 S Ct 743, 45 L ed 1041 (1900), cited in Spelar, Mr. Justice Brown had adopted the same definition, observing at p 180:

> "A foreign country was defined by Mr. Chief Justice Marshall and Mr. Justice Story to be one exclusively within the sovereignty of a foreign nation, and without the sovereignty of the United States."

We also find the following in *Cobb v. United States,* 191 F2d 604, 608:

> "* * * The conqueror does not acquire the full rights of sovereignty merely by occupying and governing the conquered territory without a formal act of annexation or at least an expression of intention to retain the conquered territory permanently. * * *"

The foregoing is in accord with 1 Hyde, International Law, 175, § 106, and U. S. Army Field Manual, supra; *Acheson v. Wohlmuth,* 196 F2d 866, 868 (1952).

We must, however, look to the context in which "foreign country" is framed. Quite often, such examination will produce what appear as opposing results. In exemplification of the foregoing statement, contrast *Dant & Russell, Inc. v. Board of Sup'rs.,* 21

Cal2d 534, 133 P2d 817, 818 (1943), where certain lumber shipped from the Philippine Islands was, in fact, an import from a "foreign country," with *M/V Nonsuco, Inc. v. Comm'r. of Internal Revenue,* 234 F2d 583 (4th Cir 1956), where the question as to whether the Philippine Islands is a "foreign country," as used in the Internal Revenue Code, and note the opposite conclusions based upon the context of the respective statutes under review in those cases. Another example is found in *Dr. Pepper Bottling Co. of Kentucky v. Hazelip,* 284 Ky 333, 144 SW2d 798, 801 (1940), where a resident of a sister state is held to be a resident of a foreign country within the meaning of a statute. We note, too, as said in *Burnet v. Chicago Portrait Co.,* supra (285 US at 6): "The term 'foreign country' is not a technical or artificial one, and the sense in which it is used in a statute must be determined by reference to the purpose of the particular legislation."

In the instant case, the question is one concerning the inheritance rights of nonresident aliens. They are "dependent * * * upon * * * a reciprocal right * * * of citizens of the United States * * * within the *countries* of which said aliens are inhabitants or citizens, and * * * the right of * * * payment * * * from estates * * * within *such foreign countries.*" § 61-107, OCLA. (Emphasis ours.) The terms, "countries," and "foreign countries," are manifestly used in the sense of an existing government. To determine what kind of "government" meets the description; that is, whether only that of a foreign nation, which is an international entity, or that of a military-occupied subdivision of the former, it is necessary to consider the object of the statute and to construe the ambiguous expressions so as to achieve, and not defeat, the legislative intent.

■ The purpose of § 61-107, OCLA, is clear beyond doubt. It was enacted to assure reciprocal rights of inheritance to American citizens and alien residents or citizens. It was, in a sense, an inducement to foreign nations to so frame the inheritance laws of their respective countries in a manner which would insure to Oregonians the same opportunities to inherit and take personal property abroad that they enjoy in the state of Oregon. *In re Estate of Krachler,* supra (199 Or at 457).

■ Defined, generally, reciprocity is the term employed in international law to describe the relation between states when each of them extends privileges and special advantages to the subjects of the other, upon condition that its own subjects shall be granted mutual and similar privileges and advantages by the latter state. Black's Law Dictionary (4th ed) p 1435. It follows then that: "The intent of the Oregon statute is that the right which we extended to a German legatee will be recognized only if the German law extended to 'citizens of the United States' * * * a right in 'like manner.' " *In Re Estate of Krachler,* supra (199 Or 458-9). Thus, we note that the sweep of reciprocity in definition and application has not been extended beyond countries in the international sense so as to include multifarious and lesser governmental entities without independent political sovereignty. *In Re Nepogodin's Estate,* supra (285 P2d 676).

■ A further analysis of the statute reveals that the word "alien" is thrice employed. Reference is made to "countries of which said aliens are inhabitants or citizens." The word, "alien," suggests a person subject to a foreign sovereignty. *Caparell v. Goodbody,* 132 NJ Eq 559, 29 A2d 563, 569, and authorities there cited; Webster's New International Dictionary (2nd

ed), p 65. The term, "citizen," refers to constituent members of a body politic owing allegiance to that sovereign. *Luria v. United States,* 231 US 9, 34 S Ct 10, 58 L ed 101 (1913); 2 Am Jur 555, Aliens § 175.

■ By a practical analysis of these terms as employed within their surrounding context, it is clearly demonstrated that the Legislature, by designating "foreign countries," intended a foreign and sovereign nation in the international sense. The fact that the plural forms of the expressions were utilized lends credence to this conclusion. It can only mean a foreign country to which one could pledge allegiance. It is undisputed that the named legatee, Emmy Schmidt, owed allegiance to Nazi Germany and not any other government on April 24, 1945, notwithstanding that Hof was then occupied by an army hostile to the country to which she owed an obligation of fidelity. See *Acheson v. Wohlmuth,* supra (196 F2d 868). Reciprocity did not exist with Nazi Germany. *In Re Estate of Krachler,* supra (199 Or 448).

■ It is also not without significance that our reciprocity statute was initially enacted in 1937, a time when this country was at peace and with no immediate prospect of war. The Legislature was not then confronted with the question of aliens claiming inheritances who were then residents of areas under militarily occupied governments. To hold that such forms of government were intended to be included in the words, "countries" and "foreign countries," cannot be asserted without explicit statutory direction.

■ It is clear to us that no rational reading of the reciprocity statute can be had without first understanding that the terms, "countries" and "foreign countries," pertain only to states or nations, and not

to sections or portions of states or territories, nor smaller segments of nations, such as Hof is to Germany. We hold that the Legislature employed these words with their larger and more comprehensive connotation and with the international aspect of common usage. For this court to diminish their larger and natural meaning, as the Custodian would have us do, would be to exercise a legislative, not a judicial, function. *Union Pacific R. R. Co. v. Anderson,* 167 Or 687, 711, 120 P2d 578.

The Custodian presents a temporary form of military government limited to a small occupied section of Nazi Germany, as one qualified to grant the reciprocity contemplated by § 61-107, OCLA, supra. At most, any form of military government is provisional before enemy surrender. Its primary concern is the prosecution of the war. There was no unequivocal showing that such a limited and provisional miltary control of the Hof area could, should or would act with regard to restoring reciprocal rights of inheritance sooner than after the moment of Germany's complete defeat and surrender. Suffice to say, this type and a transient form of government falls short of the standards embodied in the words, "countries" and "foreign countries," as they are employed in our reciprocity statute.

■ The Custodian's claim that Emmy Schmidt, as decedent's legatee, can take her bequest under the Oregon reciprocity statute must fail and with it all rights which he asserts under his vesting order.

We are of the opinion that the conclusion which we reach is the only plausible one here, for the simple reason that it is impossible to hold that such U. S. military government or control as prevailed on April 24, 1945, in the area containing Hof an der Saale

did constitute a government of a foreign country within the meaning of § 61-107, OCLA (ORS 111.070).

In so holding, we find great persuasion in what was said in *Hichino Uyeno v. Acheson,* 96 F Sup 510 (WD Wash 1951). It is there made apparent that inflexible and decisive tests cannot be summoned to aid and the solution seems to depend upon employing common sense or "common speech." This is pointed up by the following declaration from that case at page 515:

> "* * * it is obvious that the words 'foreign state' are not words of art. In using them, the Congress did not have in mind the fine distinctions as to sovereignty of occupied and unoccupied countries which authorities on international law may have formulated. They used the word in the sense of 'otherness.' When the Congress speaks of 'foreign state', it means a country which is not the United States or its possession or colony,—an alien country,—other than our own, bearing in mind that the average American, when he speaks of a 'foreigner' means an alien, non-American.

> "* * * So here, the interpretation called for is that of common speech and not that derived from abstract speculation on sovereignty as affected by foreign military occupation. * * *"

The decree of the circuit court is affirmed.