Argued April 15, reversed and remanded November 12, 1953

IN THE MATTER OF THE ESTATE OF JOHN KRACHLER,
DECEASED

STATE LAND BOARD OF OREGON *v.*
BROWNELL, Attorney General of the United States
and HAGMAIER
263 P. 2d 769

*Peter A. Schwabe,* of Portland, argued the cause for appellant, intervener. On the brief were Haas & Schwabe, of Portland.

*Catherine Zorn,* Assistant Attorney General for Oregon, of Salem, argued the cause for the State Land Board of Oregon, petitioner and appellant. On the brief were George Neuner, former Attorney General for Oregon, and Cecil H. Quesseth, former Assistant Attorney General for Oregon.

*Henry L. Hess,* United States Attorney for the District of Oregon, of Portland, and Harold I. Baynton, Valentine C. Hammack, James D. Hill, George B. Searls and John F. Cushman, Assistant Attorneys General, on the brief for the Attorney General of the United States.

BRAND, J.

The question presented for decision is whether, under the provisions of OCLA, § 61-107, a resident and citizen of Germany can take under the will of a naturalized American citizen who died on 8 December

1943 in Portland, Oregon. According to the statute, the right of the German claimant to take under the will is dependent upon the existence on the date mentioned of a reciprocal right upon the part of citizens of the United States to take from estates of persons dying in Germany. The parties join issue on the question of the existence of such reciprocal right.

In a proceeding, No. 51276, brought in the Probate Department of the Circuit Court for Multnomah County, the last will and testament of naturalized citizen John Krachler, deceased, was admitted to probate and letters testamentary were issued to John J. Beckman, who was named in the will as executor and trustee for Marie Unsold, a resident and citizen of Germany, the legatee under the will. The executor filed a supplemental final account. He thereafter died and the Portland Trust and Savings Bank of Portland, Oregon, was appointed administrator de bonis non and trustee under the will of the deceased. On 17 February 1950, the State of Oregon, by the State Land Board, filed in said case, No. 51276, in the Probate Department of the Circuit Court, a petition, seeking a decree that John Krachler died without legal heirs capable of inheriting the proceeds of the estate, and praying for an order that said proceeds be delivered to the State Land Board as an escheat. The Attorney General of the United States filed in the same proceeding an answer to the petition of the State Land Board, alleging that the German beneficiaries under the will were capable of inheriting under the law of Oregon, and that, as successor to the Alien Property Custodian, he has become the owner of all rights of the German beneficiaries under the will, this, by virtue of a Vesting Order No. 4887, issued by the Alien Property

Custodian. He also filed a petition in said probate matter, seeking distribution to him of the net proceeds of the estate. Thereafter, with leave of court, George Hagmaier filed a petition in intervention in the probate proceedings, claiming the estate as sole heir of the testator, and contesting the claims of the State of Oregon, the German heirs, and the Attorney General of the United States as successor to the claims of the German heirs. In a stipulation the parties recited that "the outcome of the within hearing of the petition of the State of Oregon will determine to whom the residue of said estate will be paid."

The cause was tried as a suit in equity in the Probate Department, and as a part of the proceedings in said case, No. 51276. After trial of the issue, findings of fact and conclusions of law were entered and a decree was rendered dismissing the petition of the State of Oregon and the petition of the intervener, and granting the petition of the Attorney General of the United States for distribution to him of the assets of the estate. The State Land Board and Hagmaier appeal.

Marie Unsold was living at the time of the trial, and so far as the record shows, is still living. For convenience, we shall refer to Marie Unsold as if she were the sole beneficiary named in the will.

The right of the Attorney General as successor in interest to the Alien Property Custodian depends exclusively on the right of Marie Unsold to inherit, for the Vesting Order seizes only such right as she had. The rights of the respective claimants must be determined as of 8 December 1943, the date of the death of John Krachler.

■ The position of the intervener Hagmaier is in accord with that of the State of Oregon. Both claim that the German legatee, Marie Unsold, is not qualified to inherit under the provisions of OCLA, § 61-107, and that therefore the Attorney General acquired no right under the Vesting Order. Hagmaier disagrees with the state only in this: He claims that there should be no escheat to the state since he is a resident and citizen of the United States and is next of kin of the deceased, and entitled to take since the named legatee is not. Whether or not Hagmaier is an American citizen and next of kin is an issue as yet undetermined, and one which the trial court will be required to hear and determine on evidence if the decision of this court is adverse to the claim of Marie Unsold and the Attorney General. The decision of this case depends upon the construction and application of OCLA, § 61-107, which reads as follows:

"The right of aliens not residing within the United States or its territories, to take personal property or the proceeds thereof in this state by descent or inheritance, is dependent in each case upon the existence of a reciprocal right upon the part of citizens of the United States to take personal property or the proceeds thereof in like manner within the countries of which said aliens are inhabitants or citizens, and upon the right of citizens of the United States to receive, by payment to them within the United States, or its territories, moneys originating from estates of persons dying within such foreign countries. In the event no heirs other than said aliens are found eligible to take such property, said property shall escheat to the state of Oregon, as provided by law in those cases where a person shall die intestate without heirs."

Section 61-107, OCLA, is a law of succession, which, as to personal property, was within the power of the

state to enact. *Clark v. Allen,* 331 US 503. As said
by the Supreme Court of California in a case under a
somewhat similar statute:

"* * * Hence the proper construction is that
sections 259 et seq. are laws of succession, that
they constitute limitations on the power of aliens
to inherit and that nonresident aliens are made
ineligible to inherit, and acquire no rights in the
estate in the absence of reciprocal rights of Amer-
ican citizens to inherit property in the country in
which such aliens are resident." *In re Knutzen's
Estate,* 31 Cal2d 573, 191 P2d 747, 751.

■ We must first determine what was the right of a
nonresident alien to take personal property by descent
or inheritance prior to the enactment of OCLA, § 61-
107, and what limitations upon that right have been
imposed by that statute. We must therefore deter-
mine what is meant by "the existence of a reciprocal
right upon the part of citizens of the United States to
take personal property or the proceeds thereof *in like
manner* within the countries of which said aliens are
inhabitants or citizens." (Italics ours.) When used
in relation to claims to property, the word "right"
means a claim or title to or an interest in anything
that is enforceable by law. *Bailey v. Miller,* 45 Ind
App 475, 91 NE 24; *Hathorn v. Robinson,* 98 Me 334,
56 A 1057. As said in the Restatement of Conflict of
Laws, a right is a legally enforceable claim. Restate-
ment, Conflicts, § 42 b.

■ There was a marked distinction at common law
between the rights of aliens to acquire lands and their
rights to acquire personal property. *Fergus v. Tom-
linson,* 126 Kan 427, 268 P 849. It is generally recog-
nized that in the absence of statute to the contrary,

nonresident aliens may inherit personal property upon the same terms as resident American citizens.

> "The disability of aliens at common law in respect to the ownership of real estate does not extend to personal property, and aliens are capable of acquiring, holding, and transmitting movable property in like manner as citizens. A statute capacitating aliens to take, recover, and transmit 'real estate' has been held to include both real and personal property." (Citing cases.) 2 CJ 1069, Aliens, § 34.

> "An alien is fully competent to take and hold personal property by bequest * * *." (Citing cases.) 2 CJ 1069, Aliens, § 35.

To the same effect see 3 CJS 587, Aliens, §§ 28, 29; *Greenheld v. Morrison,* 21 Iowa 538; *Rosgrove v. Rosgrove,* 69 Conn 416, 38 A 219; *Braga v. Braga,* 314 Mass 666, 51 NE2d 429; *Southwestern Surety Ins. Co. v. Vickstrom,* (Tex Civ App, 1918), 203 SW 389; 57 Am Jur 139, Wills, § 153; 68 CJ 504, Wills, § 123.

■ Under the able decision of this court in *Namba et al. v. McCourt and Neuner,* 185 Or 579, 204 P2d 569, it appears that aliens, including those ineligible to citizenship, may now inherit Oregon lands. If this be true, it would follow a fortiori that in the absence of statute to the contrary, aliens may inherit personal property. One comment should be made for the sake of clarity concerning the case of *Namba et al. v. McCourt and Neuner,* supra. Recourse to the original opinion of this court, on file in the office of our clerk, discloses an error in the text of the next to the last paragraph of the opinion as it appears in 185 Or at 614. A portion of that paragraph reads: "* * * our Alien Land Law (§ 61-101 to and including § 61-112, O.C.L.A.) must be deemed violative" of the equal pro-

tection clause of the Constitution. The correct text of the decision appears in 204 P2d 569 at 583, where the parallel language reads as follows: "* * * our Alien Land Law, §§ 61-101 to 61-106, inclusive, §§ 61-108 to 61-111, inclusive, O.C.L.A., must be deemed violative" of the equal protection clause of the Constitution. From the correct text it will be seen that OCLA, § 61-107, the provisions of which, properly construed, are determinative of the case at bar, was not held unconstitutional in the Namba case.

■ With the sole exception of OCLA, § 61-107, we find no statute in Oregon which limits the right of a nonresident alien to take by will from a testator dying in this state. The logical conclusion is that the "right of aliens" to which reference is made in OCLA, § 61-107, is an unqualified one so far as the laws of Oregon are concerned, and that it is the recognition and enforcement of that right which is "dependent in each case upon the existence of a reciprocal right upon the part of citizens of the United States to take personal property * * * *in like manner* within the countries of which said aliens are inhabitants or citizens." (Italics ours.) It is at this very point that the Attorney General of the United States proposes a basic misconstruction of our statute. Speaking of the statute, he says:

"* * * It denies to an alien the right to inherit in Oregon if his own country fails to treat Americans on an equal footing with its own citizens. * * * " Brief of the Attorney General, p 6.

Again, he states the question on this appeal to be "whether · * * * there existed on December 8, 1943, between Germany and the United States a reciprocal right of American citizens to take a German

estate by inheritance in like manner as a resident and citizen of Germany * * *.''

In our opinion he should have added the words ''takes an American estate'', so that the last clause of his proposition would read, ''in like manner as a resident and citizen of Germany takes an American estate.''

The proposition as stated by the Attorney General involves a basic error. The Oregon law contains no discrimination against any person on account of race, creed or political conviction, as to his rights to inherit an Oregon estate. The right of aliens to inherit is equally unqualified. All are treated alike, and all German aliens may inherit if American citizens are accorded reciprocal rights by German law. The construction of our statute, proposed by the Attorney General, would amount to a holding that citizens of the United States enjoy reciprocal, that is, equivalent, rights to inherit German estates under a German law which discriminates against classes of American citizens, if it also discriminates against German citzens of the same class. The result would be this: That under the Oregon statute, any German may inherit from any American testator, if, under German law, some Americans may inherit from some German testators. This is not reciprocity. The test of reciprocity is whether German law gives to American legatees what Oregon law gives to German legatees. If Americans are to inherit ''in like manner'', they must have rights like those which we offer to Germans. The Oregon statute manifests no interest in discouraging discrimination by the Nazi government against its own citizens. The intent of the Oregon statute is that the right which we extended to a German legatee will be

recognized only if the German law extended to "citizens of the United States",—not some citizens—but any and all citizens, a right in "like manner". The phrase "like manner" refers to the manner in which Oregon recognizes the "rights of aliens." It cannot be tortured into a construction which would mean in like manner as Germany treats its own citizens, for the statute makes no reference to that matter.

The United States Attorney General correctly states that, "it is clear that the statute is aimed at the laws of other nations which discriminate against American citizens  *  *  *", but he adds, "American citizens as such". He thereby implies that under Nazi law in 1943, Germany would be providing reciprocal rights to American citizens in exchange for the broad right extended by Oregon to German legatees, if it barred the right of inheritance to American citizens who are Jews or Catholics, Republicans or whatnot, provided only that it did not discriminate against American citizens *as such*. We reject this contention, if it was seriously intended, and hold that under the Oregon statute the right of any American citizen to inherit from a German testator in 1943 was to be deemed reciprocal only if it was the substantial equivalent of the right which the State of Oregon accorded to German legatees.

The misconception as to the meaning of reciprocal rights under the Oregon statute may perhaps have resulted from the fact that counsel for the United States who appeared here, also argued the earlier cases involving the issue of reciprocal rights which arose in California under a statute which was modeled in part after the Oregon law, but which differs materially from it. Since the California cases are cited

as authority here, it becomes necessary at the very outset to take note of the differences between the two acts.

The California statute was enacted in 1941 and remained unchanged until 1945. We quote here only the provisions of that statute relating to personal property:

> "The rights of aliens not residing within the United States or its territories to take * * * personal property or the proceeds thereof in this State by succession or testamentary disposition, upon the same terms and conditions as residents and citizens of the United States is dependent in each case upon the existence of a reciprocal right upon the part of citizens of the United States to take * * * personal property and the proceeds thereof upon the same terms and conditions as residents and citizens of the respective countries of which such aliens are inhabitants and citizens * * *." 5 Deering's California Codes, Probate Code, § 259.

A comparison of the Oregon and California statutes discloses the following differences: The Oregon act refers first, to a single concept, i.e., the right of aliens to take in this state without qualification. The California act refers first, to the right of aliens to take in California "upon the same terms and conditions as residents and citizens of the United States." Thus far, the two statutes appear to be similar in meaning. The Oregon act makes the right of aliens dependent upon "a reciprocal right upon the part of citizens of the United States to take * * * *in like manner* within the countries of which said aliens are inhabitants or citizens * * *", which obviously means that the right of Americans to take from German testators is *in like manner* as aliens take in Oregon. (Italics

supplied.) The California act makes the right of aliens dependent upon the existence of a so-called reciprocal right "upon the part of the citizens of the United States to take * * * upon the same terms and conditions as residents and citizens of the respective countries of which such aliens are inhabitants and citizens * * *." The California act does not employ the words "in like manner" by which the Oregon statute assimilates the rights of American legatees of German testators to the rights of German legatees of American testators. Under the California act it is not entirely clear whether the right of a German alien which is "dependent", is dependent upon the right of Americans to take upon the the same terms and conditions as residents and citizens of Germany take from German testators or upon the same terms and conditions as residents and citizens of Germany take from American testators. Upon one construction the measure of reciprocity under German law would be how Germans treated Germans. Upon the other construction, the measure of reciprocity would be how Germans treated Americans, regardless of the manner in which they may have treated their own citizens.

While the construction placed upon the California act by its courts has not always been clear, it appears that they consider the statutory test of reciprocity to be whether American citizens inherit German estates under the same conditions as do German citizens.

In *Arbulich's Estate,* Cal App, 257 P2d 433, 437, the Supreme Court of California apparently considered the test to be whether "the terms and conditions on which foreigners may acquire real property in Yugoslavia by testament differ from those on which it may be so acquired by Yugoslav citizens * * *."

In *Kennedy's Estate,* 106 Cal App2d 621, 235 P2d 837, the court stated the question at issue thus:

"* * * Does the evidence support the finding that 'under the Romanian laws in effect at the time of the death' of the decedent, March 15, 1949, *'citizens and residents of the United States had the right to receive real and personal property originating from the estates of persons dying in Romania on the same terms and conditions as citizens and residents of Romania,* and that reciprocity as defined in Section 259 of the Probate Code of California existed under the laws of Romania'?" (Italics ours.)

See also *In re Reihs' Estate,* 102 Cal App2d 260, 227 P2d 564; and *In re Miller's Estate,* 104 Cal App2d 1, 230 P2d 667.

■ We conclude that the California statute, on its face, and as construed, adopts a different and more liberal test as to the inheritance rights of aliens, than the one adopted under the Oregon act. It follows, that insofar as the California courts have held, reciprocal rights did not exist, and decisions, a fortiori, apply as precedents under the Oregon act. But insofar as they have held that reciprocal rights did not exist at any given time, the decisions are of less persuasive force, because made under a statute which determines the reciprocal quality of rights by comparing the inheritance right of Americans with the inheritance rights of residents of the foreign country, whereas Oregon compares the rights of Americans to inherit in Germany with the rights of Germans to inherit in Oregon.

■ In considering all cases decided in California or elsewhere, it must be remembered that the German law, as to the right of inheritance, must be decided as of a specific date, namely, 8 December 1943. The

law prior to the seizure of power by the Nazis in 1933 may differ from that which was in effect at different times under the Nazi rule, and still more, may differ from the law after the repeal of Nazi laws by the Control Council of Germany after the surrender. With these considerations in mind, we will examine the California decisions.

In *Reihs' Estate,* supra, 102 Cal App2d 260, 227 P2d 564, the question related to reciprocal rights as of 24 November 1946, and therefore subsequent to the German surrender. In that case Control Council Law No. 1 was put in evidence, repealing "those 'laws of a political or discriminatory nature upon which the Nazi regime rested.' " In that case, as in this, Dr. von Lewinski testified that "under German law, a German national and foreigners, including American citizens, all inherit on the same terms and conditions." On appeal, the decree favoring the German heirs was affirmed under the rule that the finding of the trial court was one of fact and should not be disturbed if supported by substantial evidence. The case is clearly distinguishable.

In *Thramm's Estate,* 80 Cal App2d 756, 183 P2d 97, the critical date was 7 July 1943. The trial court found that "citizens of the United States did not possess the right * * * 'to take upon the same terms and conditions as residents of Germany * * *' ". It was held that the burden of proof was upon those who claimed the existence of reciprocal rights, and since neither the alien heirs nor the Alien Property Custodian had introduced evidence of reciprocity, the decree was affirmed.

*In re Knutzen's Estate,* 31 Cal2d 573, 191 P2d 747, the decedent died in California on 24 January 1943,

leaving real property and a small amount of cash. The trial court found that no reciprocal rights existed between Germany and the United States. The United States appealed, claiming the right of German heirs under a vesting order. The case was reversed because of the controlling effect of a treaty concerning the right of inheritance in real property. The reasons for reversal have no bearing on the pending case which involves personal property only. See *Clark v. Allen,* supra, 331 US 503, 91 L ed 1633.

*In re Bevilacqua's Estate,* 31 Cal2d 580, 191 P2d 752; and in *Giordano's Estate,* 85 Cal App2d 588, 191 P2d 757, 193 P2d 771, the questions related to reciprocal rights between the United States and Italy. They are relevant only as to the construction of the California statute.

*In re Schluttig's Estate,* 36 Cal2d 416, 218 P2d 819, 224 P2d 695, the decedent, a citizen of the United States and resident of California, died testate on 3 April 1945, leaving personal property to citizens and residents of Germany. The trial court found upon evidence that reciprocal rights did not exist and awarded the property to the American claimants. Much of the evidence was similar to that presented here. The court said:

"* * * Clearly when it is shown that the taking of estates by testamentary disposition or succession is a matter of sufferance determinable in accordance with directions of the Nazi officials and their concepts of national sentiment there is no 'reciprocal right' as that term is used in the Probate Code."

The section of the Weimar Constitution was received in evidence in that case as in this and Dr. von Lewinski

testified similarly in both cases. In the District Court of Appeals the evidence was reviewed and new evidence was taken, and the cause was then sent back for a new trial. On appeal to the Supreme Court it was held that the new evidence taken in the Court of Appeals being "merely cumulative of conflicting evidence" was improperly received. The Supreme Court said:

"The principal argument by the [United States] attorney general is that the trial court misconceived the purpose and effect of § 259 of the Probate Code and therefore erroneously received evidence concerning the political philosophy and structure of the Nazi government. More specifically, he contends that the denial of inheritance rights to certain minority groups is not a material fact as long as the rule is applied equally to both American and German members of such groups. * * *"

In this case the California Court of Appeals appears to have rejected the construction suggested by the Attorney General, for it referred to "the obvious purpose of the statute which was to permit a nonresident alien to inherit when the laws of his country would permit an American citizen to inherit under the same circumstances. * * *" *In re Knutzen's Estate,* supra, 31 Cal2d 573, 191 P2d 747, 751. It was held that there was adequate support for the findings of the trial court, and its decree was affirmed.

*In re Miller's Estate,* supra, 104 Cal App2d 1, 230 P2d 667, the decedent, a United States citizen and resident of California, died testate on 22 April 1942, leaving her estate, both real and personal, to a resident and citizen of Germany. Under *Clark v. Allen,* supra, the German heir succeeded to the real property pursuant to the provisions of treaty. The question related

to the existence of reciprocal rights to personalty. Here, the trial court, contrary to the findings in *Schluttig's Estate,* held that reciprocal rights existed, and the personalty was distributed to the United States. On appeal the decree was affirmed under the rule that since the findings were supported by substantial evidence they would not be disturbed. However, the court took note of conflicting evidence to the effect that the right to inherit in the foreign countries depended upon certain policies of the Nazi regime. Other evidence received was Section 48 of the German Law concerning last wills and testaments, which was also received in the pending case. It reads as follows:

"(1) A disposition for the event of death is void insofar as it is contrary to mandatory provisions of law. (2) Any disposition for the event of death is void insofar as it is contrary—because of being grossly opposed to sound sentiment of the people—to considerations which a decedent who is conscious of his duties, must have towards his family and the community of the people."

The effect of that statute will be considered infra.

Dr. von Lewinski was again the main witness for the United States. In general, his testimony was to the effect that "under the German laws of inheritance any foreigner may succeed to an estate in Germany on the same terms as a national of that country. * * *" The court said:

"To an American it seems incredible that Hitler would permit German property to be distributed to Americans and particularly to American Jews. Yet, it definitely appears that the procedure provided by the Absentee Administration Decree for the appointment of an administrator for the inheritance of an absent national of an enemy country was fol-

lowed, and that property of German testators was distributed to administrators appointed for the purpose of holding it for such enemies, including Americans. It may very well have been that Hitler, in spite of his hatred for both Jews and Americans, concluded that *as a matter of expediency* and shrewd business it was advisable to retain reciprocity with the United States because the number of estates in which property in Germany would be left to Americans would be inconsequential as compared to the number of estates in America left to Germans.'' (Italics ours.)

Summarizing the testimony of two expert witnesses, the court said:

"Both Stern and Oppenheimer testified that the Constitution of Weimar and the German Laws permitting inheritance by Americans were not specifically changed by the Nazis. Yet, section 48, which in effect, prohibited disposition of property if it was 'opposed to sound sentiment of the people,' coupled with the fact that the judiciary were no longer independent but were, it is contended, subject to the will and whim of Hitler, denied to Americans any right to take testamentary disposition, and left such taking merely a privilege which might or might not be granted.  *  *  *''

The court construed the California statute as merely requiring "that there be no discrimination shown in inheritance matters as between the nationals of that country and the residents and citizens of ours.'' The appellate court finally held that it was bound by the trial court's findings on the facts.

The decision *In re Peters' Estate,* 110 Cal App2d 723, 244 P2d 88, is of special interest. The deceased died testate on 15 May 1944, leaving a legacy to residents of Germany. As in the other cases, the contest was between the claims of the United States under a

vesting order, which, in effect, seized whatever rights the German heirs had, on the one hand, and an American citizen, a sister of the deceased, on the other. Once more, following the California construction of its statute, the trial court found " 'that on May 15, 1944, the date of death of the decedent, citizens of the United States had the right to take personal property and the proceeds thereof on the same terms and conditions as residents and citizens of Germany;' * * *." It therefore awarded the property to the United States. The trial court, on motion of the United States, had stricken from the record evidence relative to the German law of succession. On appeal the court stated the question for decision as follows:

"Did the trial court err in granting objector's motion to strike evidence of German law relative to (a) restricting the rights of succession and inheritance because of antisocial conduct, dated November 5, 1937, and (b) the Jewish escheat statute, viz., the 13th decree for the execution of the Reich Citizenship Law of July 1, 1943?"

It then said:

"(a) The law restricting the rights of succession and inheritance because of antisocial conduct provided that a person who had been deprived of his nationality (by behavior contrary to his duty of loyalty to the Reich or by reason of his failure to return to Germany from abroad to register and serve in the German army) could not take by succession or inheritance from a German national nor could the spouse and children of such persons to whom the loss of nationality extended inherit from a German. This law might very well deprive a United States citizen of inheritance from a German if such a denationalized German became a naturalized American citizen, for he would not be able to take on the same terms and conditions as a German

citizen but would be barred from taking under this law of succession.

"It is apparent that this particular statute was material to the issue before the court and that it erred prejudicially in granting objector's motion to strike it from the evidence.

"(b) The evidence with respect to the Jewish escheat statute was likewise material.

"Under such law upon the death of a Jew his estate did escheat to the Reich, but the Reich might grant a settlement to non-Jewish heirs and persons entitled to support having their residence within Germany.

"Objector's contention that the law could have no application to American citizens as it provided for the estate of a German Jewish decedent is erroneous. If a Jewish person, a resident of Germany, died, his American heir would take nothing because the Jewish person's property would escheat to the Reich. The decree of September 1, 1944, providing that the 13th decree was not applicable to foreign Jews did not alter the situation with respect to the admissibility of evidence as to the 13th decree because it was not issued until September 1, 1944, which was subsequent to the date of death of decedent. Thus the 13th decree was in effect without amendment at the time of her demise. In addition the decree of September 1, 1944, purports to eliminate the escheat provision in so far as a nonresident Jew leaving property in Germany is concerned, but the statute would still apply to the estate of a resident German Jew so as to defeat the rights of his American heirs."

It was held that the order striking the evidence constituted reversible error. The reasoning is peculiarly applicable under the Oregon statute.

*Hess' Estate* was decided in the Superior Court of the State of California in and for the county of

Los Angeles on 23 January 1950. While the decision is not that of an appellate court, we have quoted from it because of its persuasive comments upon evidence which was introduced in that court and in the case at bar. The Hess case apparently construed the California statute as we construe that of Oregon. In a written opinion the court said:

"All that is required, therefore, under reciprocity is that citizens of the United States, either as enemy aliens or otherwise, should not be discriminated against as to inheritance even though in Germany certain discrimination may have existed as between its own resident nationals.

"*   *   *   *   *

"Petitioners introduced Section 48 of the 'Law of 1938', subdivisions 1 and 2, covering the 'Making of last wills and testaments and mutual wills and testaments'. (Petitioners' Exhibit A). These sections read as follows:

"'Law concerning the Making of Last Wills and Testaments and Mutual Wills and Testaments.

"'Sec. 48, 1st and 2d paragraphs:

"'A disposition by cause of death is null and void insofar as it is contrary to mandatory provisions of law.

"'Any disposition by cause of death is null and void insofar as it is contrary, in a way which is thoroughly opposed to a healthy national sentiment, to considerations which a decedent who is conscious of his duties, must have toward family and the national community.'

"This language characteristic of so much found in Nazi decrees and pronouncements is uncertain unless one is acquainted with 'mandatory provisions of law' and a 'healthy national sentiment' and the duties of a decedent 'toward family and the national community' as defined by the German Nazis. No decision by the German courts inter-

preting these sections was brought to the attention of the court. However, there was introduced into evidence, commentaries by D. Palandt (petitioner's Exhibit C), two apparently well known authors of commentaries. Commentaries are private writings by expert German theorists on a particular subject which are received as authority by German courts and which the judges were in the habit of consulting in making their decisions. Both D. Palandt and Achilles-Greiff held that Section 48, Subdivisions 1 and 2 quoted above, renders void any disposition by inheritance to an enemy national.

"It seems reasonable that when the Nazis referred to a 'healthy national sentiment' that meant that such national sentiment must be one which is in accord with the philosophy and point of view of the German Nazis. It is inconceivable that an allowance of inheritance by enemy nationals would be in accordance with 'healthy national sentiment' as the Nazis conceived it or it would not be in violation of considerations which a decedent who is 'conscious of his duties, must have toward—the national community'."

In the Leefers case, decided on 24 July 1953 in the Superior Court for the County of San Diego, the facts were as follows: Richard L. Leefers, an American citizen, died intestate on 15 January 1944, leaving heirs who were residents and citizens of Germany, and one who was a citizen of the United States. Under a vesting order, the Alien Property Custodian claimed the interest of the German heirs. The American claimant asserted that the German heirs were ineligible to take by reason of the California reciprocal rights act. In a 59-page opinion, the trial court considered the evidence, most of which was also introduced in the case at bar, and held that the government had failed to prove the existence of reciprocal rights. The decision

is of importance because the trial court expressly recognized the California rule of construction as follows:

> "* * * It is undoubtedly true of section 259 that 'all that it requires is that there be no discrimination shown in inheritance matters as between the nationals of that country (Germany) and residents and citizens of ours.' * * *"

The scholarly opinion in the Leefers case was handed down on 24 July 1953, one month after the decision in the *Estate of Martha Rusch,* which was decided in the Superior Court of the State of California for the County of San Francisco. In the Rusch case the Superior Court held that reciprocal rights existed between the United States and Germany as of 27 January 1944. In *Leefer's Estate,* the court commented upon the reasoning in the Rusch case and rejected it.

The United States submitted for our consideration a memorandum opinion in the *Estate of Walter* which was handed down by the San Francisco Superior Court in June, 1953. That case is also in conflict with the reasoning in the Rusch case. The Walter case involved the issue of reciprocal rights between the United States and Austria as of November 1942. It was held that such rights existed under Austrian law, but the reasoning was as follows:

> "* * * The German laws imposed upon Austria by the Hitler regime violated reciprocity as provided for by Section 259 of our Probate Code, but such so called laws were null and void so far as they affected the Austrian laws of reciprocity."

Under the California practice, the superior courts appear to be the only ones which exercise an independ-

ent judgment as to the effect of conflicting evidence. The weight of decision in those courts appears to be against the existence of reciprocal rights.

The last-named California cases are cited for the proposition that the evidence pertaining to the discriminatory laws and decrees adopted during the Nazi regime were relevant upon the issue of reciprocal rights, notwithstanding the provisions of the Weimar Constitution which purported to guarantee the right of inheritance. As will appear, much of the same evidence was introduced in the case at bar, but in weighing that evidence, we are not bound, as were the California courts, by the findings of the trial court on conflicting evidence.

■ Turning to the evidence in the pending case, we shall direct our attention first to the question as to the existence of a reciprocal right on the part of American citizens "to take" from German testators, reserving for later consideration the further provisions of the statute concerning the right of citizens of the United States "to receive, by payment to them within the United States * * * moneys originating from estates of persons dying within * * *" Germany. OCLA, § 61-107. The existence of a reciprocal right to inherit on the part of American citizens was a matter as to which the Attorney General of the United States had the burden of proof. *In re Braun's Estate,* 161 Or 503, 90 P2d 484.

A preliminary question relates to the weight which we should accord to the findings of the trial court. The United States contends that the issue for our decision is whether the findings were supported by substantial evidence. That appears to be the rule in California where most of the reciprocal rights cases have arisen.

*In re Miller's Estate; In re Schluttig's Estate; In re Arbulich's Estate,* all supra.

■ Two Oregon cases are cited as supporting the California rule. *Bennett v. Bruchou,* 163 Or 175, 96 P2d 762, and *Public Market Co. v. City of Portland,* 171 Or 522, 130 P2d 624, 138 P2d 916. Those and many other cases merely hold that the findings of the trial court are not without weight when the evidence is conflicting and the question close. Upon appeal to this court in equity cases, the substantial evidence rule does not apply. We try the case de novo after an independent investigation of law and facts.

In *Braun's Estate,* supra, which arose under the Oregon reciprocal rights law, this court held that appeals are tried de novo and that the burden of proof is upon the German heirs.

We shall hereafter refer to the three contesting parties as (1) the United States, (2) the State, meaning the State of Oregon acting through the State Land Board, and (3) the intervener, meaning Hagmaier, the American claimant.

United States Exhibit 3 was a copy of Section 154 of the Weimar Constitution of August 11, 1919, which provides (1) the right to inherit is guaranteed in accordance with the law, and (2) the share of the State in inheritance is determined by the laws.

United States Exhibit 6 was a translation of the German Civil Code concerning inheritance. It is unnecessary to set the statute forth at length. It was enacted long before 1933 and contained no discriminatory provisions against American citizens, or classes of citizens, as to the right to inherit.

The expert, von Lewinski, who has testified for the government in substantially all of the cases, testified that "the civil laws as they were at that time were decisive and could not be changed and the right to inherit could not be abrogated or impaired without a change in the constitution." He also testified:

"* * * Any foreigner could inherit, according to the German law, an estate in Germany, exactly as a German citizen and resident of Germany could inherit that estate or participate in the inheritance of such an estate. There was no difference between a foreigner and a German in that respect."

He added that the law remained unchanged to and including December 8, 1943. This testimony was taken at the first session of the trial in February 1950. He made no reference to Section 48 of the Law of Wills with which he was fully acquainted and which as we shall show, accomplished a material change in the law, the existence of which change he later admitted.

Obviously, the provisions of the constitution, together with the statute, demonstrated that until January 1933, American citizens were accorded reciprocal rights, but the bald assertion by von Lewinski that these rights remained unchanged after the Nazi seizure of power in 1933 and down to and including December 1943, requires skeptical scrutiny. It is a fact of common knowledge, and a part of current world history which every school boy can learn from textbooks that the Weimar Constitution itself provided for the suspension of the Bill of Rights by presidential decree, and that by such decree restrictions on property were "permitted even beyond the legal limita-

tions otherwise prescribed.'' It would be naive to assume without convincing evidence that the provisions of the Weimar Constitution of 1919 were limitations on the lawmaking powers of the dictator in 1943.

From *United States v. Kusche,* 56 F Supp 201, 206, we quote:

> ''The second objection of the defendant involves a proposition which is common knowledge, and of which the court can take judicial notice, viz., that when Hitler came to power in 1933 he suspended the personal liberty provisions of the Weimar Constitution of 1919 claiming to act under the power of another provision of that Constitution and thereupon and thereafter he established an absolute dictatorship based upon the tenets of national socialism. That was a new Government. * * *''

In *Tidmore v. Mills,* 33 Ala App 243, 32 So2d 769, the Alabama court quoted the foregoing from the Kusche case with approval. In a case of this kind we cannot sit in an ivory tower, blind to facts which are of universal knowledge and of such fundamental importance as to be a part of current world history.

> ''There are certain facts of such general notoriety that they are assumed to be already known to the court. Of those facts evidence need not be produced.'' OCLA, § 2-501.

> ''The following facts are assumed to be thus known:
> ''* * * * *
> ''(8) The laws of nature, the measure of time, and the geographical divisions and *political history of the world.*
> ''* * * * *'' OCLA, § 2-502. (Italics ours.)

The fact that Hitler ruled by decree as the supreme

legislative, executive and judicial authority of the Reich is a part of such world history. NOTE*

While it is conclusively established that the Nazi government did not accord binding authority to the provisions of the Weimar Constitution and did rule by decree as a sovereign dictatorship, those facts do not of themselves establish that the Nazi laws denied to Americans enforceable reciprocal rights of inheritance. They were not bound to grant such rights but whether they did so remains to be determined.

United States Exhibit 10 was an ordinance relating to the appointment of curators for absent persons. It reads as follows:

"Pursuant to legal authority and with the concurrence of the High Command of the Armed Forces and the Commissioner General of Econom-

---

* The interested reader may consult the following texts:

"Europe Since 1914" by Benns. Appleton-Century-Crafts, Inc., New York and London.

"Contemporary Foreign Governments" by Beukema & Geer, p 162. Reinhart & Co., Inc., New York.

"This Age of Conflict" by Chambers, p 455. Harris & Bayley. Harcourt Brace & Co., New York.

"Der Fuehrer" by Conrad Heiden, p 575. Riverside Press. Houghton, Mifflin Co., Boston.

10 Encyclopaedia Britannica, 1935 ed, p 219.

See also the following Government publications:

3 Nazi Conspiracy and Aggression 968. Government Printing Office.

"Statutory Criminal Law of Germany". War Dept. pamphlet no. 31-122, p 197.

4 Nazi Conspiracy and Aggression 638. US Government Printing Office. (Setting forth text of the Enabling Act of 24 March 1933 which reads in part as follows):

"The Reichstag has resolved upon the following law which is promulgated herewith with approval of the Reichsrat after it has been established that all the requirements of legislation for changing the constitution have been complied with.

"* * * * *

"The laws for the Reich resolved upon by the Reich Cabinet may deviate from the Reich-Constitution so far as they do not deal with the institution of the Reichstag or the Reichsrat as such. The powers of the Reich-President will remain intact.

"* * * * *"

ics, the following is hereby decreed for the Greater German Reich:

"* * * * *

"Section 2. The Reich Minister of Justice can assign probate jurisdiction in matters pertaining to the administration for absent persons either generally or in individual cases to a provincial court or provincial supreme court, *and also prescribe a procedure at variance from that prescribed in the general law.*

"Section 3. The appointment of an administrator for an absent person who is a national of an enemy country shall not be prejudiced by the prior appointment of a person to whom such national has given a full power of attorney.

"Section 4. Administration for an absent person who is a national of an enemy country requires an order from the higher administrative authority in the district where the probate court is located.

"* * * * *

"Section 6. The Reich Minister of Justice shall determine which countries shall be considered enemy countries within the meaning of Sections 3 and 5.

"* * * *" (Italics ours.)

As evidence showing that curators might administer property of absent persons, the exhibit is adequate. But, to our mind, the provisions copied smack of administrative discretion, violative of "general law."

United States Exhibit 8 was the Devisen Control Law of 12 December 1938, enacted prior to the war. It related to the control of foreign exchange in Germany. Its provisions are concerned with the right to "receive by payment" as distinguished from the right to "take", that is, to inherit. OCLA, § 61-107. Further discretionary authority appears in this law:

"* * * * *

"§ 95. The Reich Minister of Economic Affairs may with the concurrence of the directorate of the Reichsbank, exempt wholly or partly, certain persons from the restrictions and prohibitions of this law and the regulations issued for its administration.

"" * * * *""

The Enemy Property Decree of 20 January 1940, as amended in 1941, being Exhibit 11, defines enemies as "Natural persons who are nationals * * * of an enemy state or who have their domicile or abode on the territory of the enemy state; * * *." The power of discrimination is again manifest in the provisions of Title II of the act:

## "TITLE II

"Section 5. *Prohibition of Payments* * * *
"(1) It is prohibited to make payments directly or indirectly to enemies abroad in cash, in bills of exchange, checks, by transmission or in any other way.
"(2) The Reich Minister of Economic Affairs may permit exceptions from the prohibition on payments under (1)."

United States Exhibit 132 reads as follows:
"December 1942. Year 46, copy 12, no. 4044-4438a.
"4110. 1922 BGB. The decedent's estate devolves by force of law to the heir, even if he lives abroad, and it is to be considered as his property, as long as it has not been effectively rejected. Muenchen, Sept. 9, 1942, DFG 42, 137."

United States Exhibit 134 provides:
"During the war, American heirs need not prove their right of inheritance through official documents. Other means of evidence are sufficient. * * *."

Concerning this exhibit Dr. Stern testified:

"A It isn't a citation from a case; it is a citation from a citation. It is a one sentence digest of another—of a head note of a case; the lowest court in the hierarchy."

Many exhibits were introduced which relate to the control under German law of foreign exchange (the Devisen Control Law.) These laws bear upon the right to receive payment as distinguished from the right to inherit and take title. However, two such exhibits seem to throw some light upon the question of the right to inherit. Under the Oregon statute the right of aliens to inherit is dependent upon the right of a broad class, to wit, all American citizens to inherit. A letter, Exhibit 141, under date of 17 August 1939, and relating to the transfer of inheritances, was sent from the German Embassy to the U. S. State Department. We quote a portion: "* * * Therefore, under the present ruling no inheritance can be transferred to an American national residing in a foreign country other than the United States." It will be observed that the Oregon statute refers to the right on the part of citizens of the United States, without regard to residence within or without the territory of the United States.

U. S. Exhibit 142 consisted of a State Department memorandum of a conversation between the First Secretary of the German Legation and a State Department official. It also dealt, in general, with foreign exchange problems and the right "to receive", as distinguished from the right to inherit. We quote:

"I mentioned to Dr. Resenberg that I had seen in two instances in correspondence which had passed through the State Department references to the racial origin of beneficiaries in communications

emanating from the Devisenstelle. I told Dr. Resenberg that I understood that when the *aide memoire* of December 16, 1938 was presented by Herr Thomsen to Mr. Welles, Herr Thomsen informed Mr. Welles that questions of race were not to be raised in connection with such transfers.''

The German official replied that he would bring the matter to the attention of the German Foreign Office. He agreed ''that the question of racial origin was not to be raised in connection with transfers.'' The memorandum bears date of 14 November 1939.

An exhibit no. 146 was introduced by the United States, which on its face tends to indicate an unqualified right of American citizens to take bequests from German testators, but only to the extent to which German citizens might inherit. The exhibit consists of a letter from the German Foreign Office to the Swiss Legation in Berlin. We quote a portion:

''The right of American citizens to inherit property in Germany, including bequests in wills, is neither abrogated nor limited. Limitations in the disposition of property, which is inherited, are made in the decree of January 15, 1940, regarding the treatment of enemy property (German Official Gazette I.S. 191) in connection with the decree of April 9, 1941 (German Official Gazette I.S. 171).

''Obtaining possession of the property inherited takes place, in case the inheritence [sic] is obtained under German laws, on the same principles for foreigners as for German citizens. * * *''

The United States introduced in evidence Exhibit 148 which is of extreme importance in the pending case. We quote:

''Law Concerning the Making of Last Wills and Testaments and

*Mutual Last Wills and Testaments*

"§ 48.

"1) A disposition for the event of death is void insofar as it is contrary to mandatory provisions of law.

"2) Any disposition for the event of death is void insofar as it is contrary—because of being grossly opposed to sound sentiment of the people—to considerations which a decedent who is conscious of his duties, must have towards his family and the community of the people."

The government's witness, Dr. von Lewinski, testified that Section 48 was an amendment to the German Civil Code and a part of the law of inheritance. It was passed on 31 July 1938 during the Nazi regime, but before the war. The law was in effect throughout December 1943. It applied to bequests made by will and, as originally enacted, did not apply to intestate succession.

The intervener introduced in evidence as Exhibit 153 a portion of a treatise on the law concerning last wills and testaments by Dr. Otto Palandt, retired president of the German Reich Examination Office in Judicial Matters, and a member of the Academy of German Law. Numerous German judges collaborated in preparation of the text. Paragraph 2 of Section 48 of the Law of Wills, supra, is described as "one of the most important provisions of the new law and the cornerstone of the future substantive law of inheritance. * * * *" From the 5th edition published in 1942 we quote relevant portions, omitting the numerous citations to other German authorities:

"* * * According to Paragraph II, a last will and testament is valid only if the will of the testator expressed therein materializes the will of

the legal community [authority cited]. As a means of counterbalancing the freedom of testation on the part of the testator, the provision is intended to exterminate much more rigidly as [than] heretofore dispositions by cause of death *which violate the duties of the testator*, 'in so far' as they deserve it, and thereby to clear the way for a *duty-controlled* right of inheritance, and, in a given case, for the legal order of succession. * * * The provision is intended, for instance, to encompass the following cases: a testamentary disposition in favor of a mistress to the disadvantage of the family; a testamentary disposition leaving family jewelry, antique table silver, family heirlooms and the like to strangers without justifiable reasons; a testamentary disposition leaving valuable objects of any kind to an organization inimical to the State; appointment of a Jew as heir of an Aryan' (Motivation of the Law in DJ *38,* 1259, decree for the execution thereof of September 24, 1941, DJ 958; it is clear, therefore in accordance with the proposals of the Commission on the Law of Inheritance (Memorial 116 and following), that not only the charge of violation of the good morals, but also the violation of the general interests of race and nation cause nullity, even though the respective individual cannot be blamed therefor * * *. As regards the question of nullity, the *healthy national sentiment* (a term already used in the Law concerning the Abuse of the Process of Execution, of December 13, 1934, RGBL 1234) is an important criterion. The judge is thus to be spared the necessity of treating a disposition by cause of death valid which, according to the national opinion cannot claim validity, Memorial 119. It must be kept in mind, that Section 48 II is only aimed at *grossly-objectionable violations of duty* (RG *163,* 61.) * * * Other examples of nullity annotation 1 to Section 15, and in addition thereto: disposition of the entire estate (to the exclusion of near relatives) to the church (* * * with the exception of last wills by clergy-

men, nuns; see also III), to a foreign freemasonry association, especially to nationals of an enemy country (except in special cases: disposition in favor of Facist, Falange for reasons worthy of consideration), to a confirmed criminal  *  *  *.''

Dr. Lewinski, whose testimony impresses us as biased, commented upon the last portion of the text which enumerates types of void bequests. The question related to the meaning of the words ''disposition * * * to a foreign freemasonry association, *especially to nationals of an enemy country* * * *.'' (Italics ours.) The witness argued that the words ''especially to nationals of an enemy country'' were not an independent category of prohibited bequests but merely modified the words ''disposition  *  *  * to a foreign freemasonry association''. In effect, he contended that Palandt meant to say that a disposition to a foreign freemasonry association which is a national of an enemy country constitutes a single category. He conceded, however, ''I wouldn't dare to say with absolute certainty that my opinion is right * * *.''

The strained construction urged by Lewinski does not appeal to us as reasonable. Palandt had already described freemasonry associations as ''foreign'' and he certainly did not mean that an association is a ''national'' of an enemy country. The word ''nationals'' obviously referred to individuals and not associations, and ''nationals of an enemy country'' being separated from ''association'' by a comma, constituted a separate category of persons to whom a disposition by will would be void.

The record also contains excerpts from the 6th edition of D. Palandt, Civil Code, from which we quote: ''*  *  * par. II (of art. 48) contains a self-executing rule concerning nullity by which the free

testamentory [sic] power of the testator is necessarily limited in the interest of race and nation. * * *"

Under the legal system of the Third Reich, commentaries by learned authors were of especial significance. Dr. Stern, in our opinion, a qualified expert on German law, and the adviser to the Attorney General of California on foreign law, explained that under the German system there was no rule of stare decisis. Unlike the Anglo-American system, the German courts were not bound by earlier decisions, and relied more upon learned commentaries than upon decided cases. He testified:

"* * * A court, therefore, has, as a source of its decisions, the statutory law of Germany. * * * In order to find out what the law on a particular point is and how a point of law, how a law should be applied, a German court would look first at the source of German law, secondly, at the interpretation thereof. * * *"

The court received in evidence as Exhibit 156 a translation of commentaries on Section 48 of the Civil Code by Achilles-Greiff. We quote portions from the 18th edition of the work published in 1944:

"* * * Sec. 48, par. 2, creates a duty-determined law of inheritance! 5. See DFG 39, 52; DR 42, 538.—Examples: gift of family memorial objects, family jewelry and the like to strangers without any justifiable reasons (see also REG sec. 8, Civil Code sec. 2373, note 5 and sec. 2047, par. 2): gifts to enemies of the State or to organizations inimical to the State (compare also Law of Nov. 5, 1937, above note 2); appointment of a Jew by a testator of German blood (as to this point see the previous decisions: DJ 36, 1579; 38, 309; and now provision for the execution of the law of Sept. 24, 1941 (DJ p. 958 and DR 41, 2329), unless there

exists an exceptionally important reason for giving preference to a Jew, * * *.''

Both commentaries were the composite work of experts.

Exhibit 158 contains excerpts from a book by Hans Frank, president of the Academy of German Law, and written by a professor at the University of Freiburg. It relates to '' 'Good Morals' in the Light of National Socialist Family Duties.'' The term ''Good Morals'' is used as the equivalent of ''sound sentiment of the people'', or ''healthy national sentiment'', as those phrases are used in various translations of Section 48 of the Code. The author points out that court decisions and writers had adapted themselves to the change in the meaning of good morals even prior to the adoption of Section 48 of the Law of Wills. He continues:

'' ''* * * A political revolution if it reaches the soul and moral basis of the national life, may and must include socio-ethical values and must subject the latter to more or less radical changes in the direction which is indicated by the newly created political order. As a result thereof, the contents of the term ''good morals'' has become a new one, without needing fixation by law. Exactly this is the advantage of a general clause over an individual rule of law, the advantage of the ius aequum over the ius strictum, that it can adapt itself to the changing demands of the national moral philosophy without a formal change in the law. * * *

'' ''* * * The new term of ''good morals'' is then merely the belated formulation of a change in the law which already has taken place. This formulation does not create the change, it merely confirms it. I have already pointed out in (here follow citations) that this is also the case as regards section 48, paragraph 2 of the Law of Last Wills. * * *','''

Referring to Section 48, paragraph 2, the author writes:

" 'The practical importance of the change in the term "good morals" lies first of all in a contemporary increase of the circle of turpes personae whose preference over relatives who should inherit, causes the nullity of the disposition, to persons of alien races, enemies of the state, denaturalized persons, enemy aliens, and in proper cases also organizations which do not serve common good.' "

Dr. Stern testified:

" * * * this law brings National Socialist concepts into law and that by the new definition of what is termed 'good morals' as found in this Section 48, Paragraph 2, certain persons who previously had not been turpes personae were made such turpes personae, and that to persons who so became turpes personae belong persons of alien races, enemies of the state, denaturalized persons, enemy aliens, and in proper cases also organizations which do not serve the common good."

The intervener introduced in evidence as Exhibit 151 a translation of the Decree of October 4 which reads as follows:

"DECREE FOR THE SETTLEMENT OF ESTATES IN CASES OF SUCCESSION BY LAW IN SPECIAL CASES, of October 4, 1944.

"Sec. 4. To the extent to which an heir at law could by reason of section 48, Para. 2, of the Law of Last Wills and Testaments not effectively have been appointed in a disposition by cause of death, the accrual of the inheritance is deemed not to have taken place. To this extent, the inheritance passes, effective with the accrual of the inheritance, to the person who would have been entitled to it if the excluded person would not have lived at the time of the accrual.

"Sec. 5, Par. 3. Section 4 is applicable to all accruals of inheritance which have taken place after

the coming into force of the Law of Last Wills and Testaments unless the settlement of estates has already been terminated at the time when this decree comes into force.

"Sec. 8. This decree will come into force on November 1, 1944. It does not apply to the succession of persons in Protectorates."

Dr Stern construed the act as extending the limitations of Section 48 to intestate succession as well as inheritance under will. He further testified that the decree was retroactive and applied to all cases in which an estate had not been settled prior to 31 July 1938.

A resolution of the Greater German Reichstag of 26 April 1942 was introduced as Exhibit 162. It reads in part:

"* * * The Fuhrer, therefore, must—without being bound by existing rules of law * * * as supreme lord of the judiciary * * * at any time be in a position to order, if necessary, any * * * judge * * * to fulfill his duties, and to visit him, in case of violation of these duties, * * * with the punishment which is due to him, without regard to so-called vested rights, and to remove him from his office, * * * without the institution of prescribed procedures."

Dr. Stern testified as to the application of Section 48 of the Code as follows:

"THE WITNESS: In my opinion, the rulings of the Courts would not be the rulings of an independent judiciary; it would be the rulings as based on instructions received in a particular—received either in a particular kind or in general form or rulings based—rulings made under a general threat that if they would not comply with Nazi ideology, that punitive measures would be taken against them.

* * * * *

"THE WITNESS: * * * I think I stated, that there were doubtless numerous judges who tried to preserve their judicial independence, many of whom actually preserved it. There were, however, a great number who did not preserve it and could not preserve it even though they wanted to preserve it."

The intervener offered in evidence portions of an historical work entitled "German Justice" which was published in 1949, and excerpts from the judgment in *United States v. Alstotter* by the U. S. Military Tribunal in Nurnberg. Both exhibits dealt with the destruction of judicial independence under Hitler. Objection to their competency was sustained and they were received only under the equity rule. The exhibits were merely cumulative and we deem it unnecessary to decide as to their admissibility.

On 14 July 1933 a law was passed "For the Revocation of Naturalization and the Deprivation of German Nationality." Portions of the text appear in Exhibit 168. We quote:

"Sec. 2. Reich nationals who are abroad, may be declared deprived of their German nationality if they have damaged German interests by a behaviour which is contrary to their duty of loyalty against the Reich and Nation. The same applies to Reich nationals who do not obey an order to return which has been directed to them by the Reich Minister of the Interior under reference to this rule.

"Sec. 3. The Reich Minister of the Interior, in agreement with the Reich Minister of Foreign Affairs, decrees in each particularly [sic] case the extent to which the loss of German nationality applies to spouses, to legitimate or legitimated children, and in the case of women, to illegitimate children."

On 5 November 1937 there was enacted a "Law Restricting the Rights of Succession and Inheritance Because of Antisocial Conduct." Excerpts appear in Exhibit 166 as follows:

"Sec. 1. Exclusion of de-naturalized persons from taking by succession, inheritance, and gift.

"(1) A person who has been deprived of his German nationality by virtue of Sec. 2 of the Law of July 14, 1933 (official Gazette 1, p. 480), cannot take by succession or inheritance from a German national.

"(2) The same applies to the spouse and the children of the persons referred to in par. 1, to whom the loss of nationality extends according to Sec. 2, par. 4 of the Law of July 14, 1933.

"(3) Gifts by German nationals to persons referred to in paragraphs 1 and 2 are prohibited. Anyone who makes or promises a gift contrary to this prohibition, is punishable with imprisonment up to two years and with a fine or with one or the other of these punishments.

"Sec. 2. Deprivation of the compulsory portion because of mixed marriage.

"A testator of German nationality and German or racially related blood may deprive a descendant of his compulsory portion if the descendant, being a national of German or racially related blood.

"(1) has entered matrimony, contrary to the statutory prohibition, with a Jew as defined in Sec. 5 of the First Decree under the Reich Citizenship Law of November 14, 1935 (Official Gazette 1, p. 1333), after September 16, 1935; or

"(2) has entered matrimony with a Jewish person of mixed blood without the permission required by Sec. 3 of the First Decree for the Execution of the Law for the Protection of the German Blood and the German Honor of November 13, 1935 (official Gazette I, p. 1334)."

Concerning the last two exhibits, Dr. Stern testified:

"If a person was deprived of his German nationality for the reasons that his behavior, from the German point of view, was deemed contrary to his duty of loyalty against the German Reich and the German Nation; or if he was an individual who did not obey an order given to him to return to Germany; if this person became an American citizen by naturalization he, under this law, under the law of 1937, was unable to take by succession or inheritance from a German National and the testamentary disposition made contrary to this law was void under Section 48 of the law of 1938, paragraph 1."

He cited commentaries as supporting his opinion.

The "13th Decree for the Execution of the Reich Citizenship Law" enacted on 7 July 1943 appears in evidence as Exhibit 181. It provides in part:

"Sec. 2.

"(1) After the death of a Jew, his estate escheats to the Reich.

"(2) The Reich, however, may grant a settlement to those non-Jewish heir[s] and persons entitled to support, who have their usual residence within Germany.

\*   \*   \*   \*   \*

"Sec. 3. The Reich Minister of the Interior will, in agreement with the Supreme Reich officers, issue the legal aid administrative regulations which are necessary for the execution and supplementation of this Decree. In doing so, he will determine the extent to which this Decree is applicable to Jews of foreign nationality."

In an attempt to overcome the effect of the commentaries of Palandt and Achilles-Greiff, the United States offered excerpts of commentaries by Dr. Otto Warneyer and Dr. Werner Vogels by Exhibits 185 and

187. Both commentaries were written before the war. However, both commentaries support, in part at least, the position of the intervener. From the treatise of Dr. Otto Warneyer, retired Justice of the Supreme Court at Leipzig, we quote:

"A transaction against good morals is void by virtue of Section 138 Civil Code*. The contents of Section 48, Paragraph 2 of the new law express essentially the same thought, however, in a form adapted to the special situation of last wills and mutual testaments. The provision is to apply, for example, to the following cases: a gift to a mistress to the disadvantage of the family; the gift of family-jewelry, of table-silver, family souvenirs, etc. to strangers without convincing reasons; the gift of assets of any kind to an organization inimical to the state, appointment of a Jew as heir by an Aryan, disinheriting near Aryan relatives. (*Translators note: Section 138 Civil Code, in its pertinent part, reads as follows: 'A transaction which is opposed to the good morals, is void'.)"

Dr. Vogel's commentary contains the following:

"As may be gathered from the motivation * * * sec. 48 par. 2 is mainly concerned with the following cases: a gift to a mistress which is disadvantageous to the family [authorities cited]; appointment of a Jew as heir to an Aryan, skipping the Aryan relatives [authorities cited]; the gift, unwarranted by the factual situation, of family heirlooms, family jewelry, old table silverware and such to strangers * * * the gift of assets of whatever kind to an organization inimical to the state * * *."

It will be observed that among the citations in support of the text is a decision of the Supreme Regional Court of Munich. The author continues:

"The regulation leaves a rather wide margin to the judicial discretion. However, discretion should

not be confused with arbitrariness. In each individual case where the question of the applicability of sec. 48 par. 2 arises, the judge has to examine with special care whether the prerequisites required by the law are present.  *  *  *

*  *  *  *  *

"*  *  *  the disposition will be void only if special aggravating reasons are added, for instance the disregard of the Aryan next of kin in favor of a Jew or a mistress, the skipping of a needy and worthy near relative in favor of a well-to-do, unworthy relative or stranger (of the same opinion Greiser  *  *  *)."

There is a direct conflict of expert opinion as to whether Section 48 prohibited all bequests to American citizens during the war by reason of their being enemies under the definition of the Enemy Property Decree of 20 January 1940, or nationals of an enemy country, as the phrase is used in Palandt's commentaries. Dr. Stern and the witness Linde, both qualified experts, were of the opinion that an American citizen could not inherit, while Dr. von Lewinski adhered to his usual contention.

A commentary on Section 48 by justices of the Supreme Court on the law concerning the making of last wills and testaments was introduced as U. S. Exhibit 189. The excerpts are from the 9th edition published in the year 1940, and relate to Section 48 which was passed in 1938. This treatise, perhaps because of the date of its publication, neither includes nor excludes nationals of an enemy country from the right to inherit, but it does hold that the appointment of a Jew by an Aryan testator, to the exclusion of nearest relatives, would be void. It states further that whether a testator grossly violates his duties is to be "decided

by the judge according to his judgment, taking into careful consideration all pertinent circumstance[s] of the individual case.   *   *   *''

On cross-examination Dr. von Lewinski admitted that the German government confiscated most of the Jewish property and that ''by decree, all of these various decrees, against the Jewish population of Germany, a great many rights were taken away. Property was taken.'' He agreed that Palandt's commentary meant that a German layman could not leave his entire estate to a church and by-pass relatives, though a priest or a nun might do so. He admitted that a bequest to a freemasonry association would be void.

A question arises as to the credence which should be accorded to the testimony of Dr. von Lewinski. The case at bar was tried in two widely separated sessions of the circuit court; the first in February 1950, and the second in September of that year. At the first session the witness testified at great length to the effect that the Weimar Constitution guaranteed the right to inherit and that the Civil Law could not be changed without change in the constitution of 1919. He testified that Exhibit 6 was a correct translation of the Civil Code, with two exceptions, and that the two changes were in Section 1933 and 1936. Those changes were irrelevant to the present controversy. He testified that the German inheritance law ''as contained in the Civil Code'' was in force in December 1943. He gave no testimony concerning Section 48 of the law concerning wills which was enacted on 31 January 1938, although he had repeatedly testified concerning it in other cases. Counsel sought to excuse the witness by stating that he ''forgot about it''. Section 48, which lies at the heart of this controversy, was not

introduced in evidence until, at the second hearing, counsel for the intervener asked leave to introduce it. It was then offered by the United States, and at that time the witness von Lewinski admitted that Section 48 was an amendment to the German Civil Code and a part of the law of inheritance. Then, for the first time, he conceded that Section 48 would affect the right of an American citizen in certain particulars. We quote:

"Q Now, if a bequest were made to any American citizen, whether President Roosevelt or whether a soldier in the armed service, or to a mere civilian, would you say that such a bequest to an American civilian would be valid if made to the exclusion of the man's relatives in Germany?

"A If the bequest was made to the exclusion of near relatives, meaning the bequest was made to a stranger from the viewpoint of relationship, then it would insofar be invalid."

Again he testified:

"Q Now, a number of examples have been given—I ask you, Doctor, if a bequest violated any of the terms of the law of 1938, was that will absolutely void or was it merely voidable?

"A If the bequest violated the law of '38 it became void.

"Q It became void ab initio?

"A Ab initio."

We think his testimony at the first hearing was lacking in the candor to be reasonably expected of a government expert witness, and that his subsequent testimony contradicts the sweeping assertions made at the first hearing.

Bruno C. Linde, an attorney of this state who qualified as an expert on German law, testified:

"A * * * Chronologically, the change of the law of inheritance was enacted in four stages.

The first stage, everybody could inherit; no discriminations. The second stage, a law of November 5, 1937, declaring that expatriated persons should be unworthy to inherit. According to this law they were regarded as not living; those persons did not inherit at all. The third stage was the law of July 31, 1938, which is in issue here. Now, I might as well right now and here go into this, into the history of the fourth stage.

"After the Nazis had enacted Section 48 declaring last wills and testaments void under certain conditions, they found themselves faced with the problem of what about the result in a case like this, because the man didn't take under the last will and testament? What about his taking under the rules of intestacy? So in 1944 they enacted an amendment with retroactive force that a man who couldn't take under the law of July 31, 1938, couldn't take as a— under the rules of intestacy either."

He gave as his opinion that on 9 December 1943 an American citizen could not inherit property in Germany under the will of a German testator. He further testified that in his opinion, under Section 48, a bequest by a German "Aryan" national to a person of Jewish faith who was an American citizen would be void, even though the bequest did not exclude his near relatives. He added that it "would be absolutely void, combined with danger to his life and security."

The final exhibit received by the court was a letter from the State Department signed "For the Acting Secretary of State" by Green Hackworth, Legal Adviser. Hackworth is the author of the exhaustive work on international law which is standard authority in the United States. The letter was addressed to the clerk of the State Land Board of Oregon, and is in some important respects contrary to the position taken

by the Attorney General of the United States in the case at bar. We quote in full:

## "DEPARTMENT OF STATE
## "WASHINGTON

October 5, 1945

"My dear Mr. Griffith:

"I refer to my letter dated September 13, 1945 in reply to your letter of June 15, 1945 regarding reciprocal rights relative to the acquisition, possession, or disposition of property as between the United States and Germany after the outbreak of the war.

"The Department has now received the information which it sought from its representatives in Germany on this point. It has been informed that after the outbreak of war American citizens were not prohibited by any general German law from taking by will or inheritance property in Germany.

"The Department is informed, however, that there were certain exceptions to the general right of Americans to take property by intestate succession or by will, which were as follows: Persons ceasing to be German nationals by reason of the German law of July 14, 1933 or classified thereunder as persons of mixed blood were deprived of the right of inheritance, apparently regardless of whether they became American citizens. The hereditary farm law permitted only persons who were German citizens to inherit farms having an area of twenty-five to one hundred and twenty-five hectares. Property in Germany could not be inherited by a Jew who had left Germany but had not become a national of a foreign country; and a regulation issued July 1, 1943 provided for the confiscation at death of all Jewish owned property, with compensation only to legal heirs who were non-Jewish persons domiciled in Germany.

"The Department is further informed that a German law of October 1944 permitted probate courts to deviate from the regular rules of the testamentary disposition or other succession when 'the healthy sentiment of the people' so required. It does not appear that this provision was actually applied to discrimination against American citizens, although it might have served for such discrimination.

"The Department is further informed that all American property rights in Germany were, during the war, subject to control by the Reichs Commissar for enemy property, but that administrators of enemy property were appointed for estates by the Reichs Commissar, at first only when the value exceed 25,000 Reichsmarks, and subsequently only when it was greater than 50,000 Reichsmarks. Administrators were appointed by the probate courts in cases of lesser value and settlement was suspended until it should become possible to notify the foreign heir and afford him an opportunity to claim the inheritance. Administration was not suspended when there was in Germany any authorized legal representative of the foreign heir. Property held by such an administrator or by the Reichs Commissar was subject to forced sale, the net proceeds being deposited in blocked accounts.

"Sincerely yours,

"For the Acting Secretary of State:
"(Sgd) Green H. Hackworth
"Green H. Hackworth
"Legal Adviser"

It does not appear that the State Department had before it the text of the Oregon statute concerning reciprocal rights, or that the Secretary of State intended to construe the Oregon statute. The letter does indicate that in many cases the claims of American legatees were recognized, notwithstanding the provisions of

Section 48, and the evidence in the case at bar is to the same effect, although the evidence here also conclusively shows that under the written law of Germany in 1943 a right of inheritance in many cases would not have been recognized.

It remains for us to consider the effect of some hundreds of pages of records of individual cases on which the United States relies as tending to show that in actual practice there was no discrimination against American citizens as legatees. We shall consider this type of evidence only for its bearing upon the right to inherit. We deem it unnecessary to the decision of this case for the court to consider what rights Americans might have had to "receive by payment to them within the United States * * * the amount of the legacies." If there was no right to inherit, the question as to the right to receive would be immaterial. OCLA, § 61-107, supra.

It is impossible in this opinion to review the individual cases of which there are several hundred. Dr. von Lewinski testified that he had handled 400 cases for American citizens between 1932 and 1949, and that the American heirs had received the inheritances, but he also testified that after 7 December 1941 no transfers of funds were made. Obviously the cases to which he referred were settled, either before the war or after May 1945. These have no bearing upon the practice from 1941 to 1945.

A mass of "erbscheins" or certificates of inheritance show that residents in America were recorded as inheritors of German estates. These certificates were issued by German probate courts in ex parte proceedings. The citizenship or nationality of the heir was not stated, although residence, when known, was

set forth. They are not the result of adversary hearings and were not final adjudications. The court which issued them had the power to recall them and reissue other and different certificates. They established merely presumptive heirship. A large proportion of the certificates were issued in cases of intestacy prior to the passage of the decree which extended the provisions of Section 48 to intestate succession. They were therefore immaterial. Many of the certificates were issued prior to the entry of the United States into the war. Many of them were issued pursuant to the German law concerning "non-contentious litigation".

The witness Clostermann, member of the Oregon Bar, testified that he had handled numerous claims of American citizens. He said all were paid except as to cases which were pending in 1950. Since no payments were made during the war, the cases to which Clostermann referred must have been settled before December 1941, and so far as the record is concerned, they may have been settled at any time after 1927 when the witness first became active in the handling of such claims.

Again, a large number of case records were introduced showing that curators or administrators were appointed by German courts for property located in Germany but owned by persons in the United States. Many of them did not relate to the right of inheritance and are material, if at all, merely to show that property owned by Americans was not confiscated at the time of the appointments of the curators.

One exhibit on which the United States relies consists of a list of 235 administrators or curators appointed by the German government for American-

owned property in Germany. The list is dated 29 January 1943. Many of the properties listed were owned by corporations in America who were certainly not legatees of German testators. The list showed residence only, and not citizenship of the American owner. Dr. von Lewinski testified that the list related to absent heirs. He did not say whether the owners were heirs of American testators or of Germans. The list contains the names of many Jews as owners and also as heirs. It does not show that any of them were heirs of deceased non-Jewish testators in Germany. The evidence indicates that a bequest by a German Jew to a Jew in the United States would not be void under the construction of Section 48, although a bequest by an "Aryan" to a Jew would violate the sound sentiment of the people. It is of special importance to notice that the list which contains the names of Jewish owners as legatees or claimants by intestate succession is dated 29 January 1943, before the enactment of the 13th Decree of July 2, 1943, which provided that after the death of a Jew his estate escheats to the Reich and that the latter decree was enacted before December 1943, the critical date in the case at bar.

By way of summary we would say that the vast mass of material which we have been compelled to examine becomes far less impressive upon analysis. We have no doubt that there were instances in which Jews, resident in this country, and presumably citizens as well, did inherit from some German testators and did receive payment prior to 7 December 1941, and that the claims of other American residents who were presumably citizens of the United States were treated as prima facie valid in many instances during the war,

although payment was withheld under currency regulations which existed, both in Germany and in the United States. Assuming this to be true, it does not follow that German law gave to American heirs and legatees legally enforceable rights the equivalent of those which Oregon would accord to German legatees in the absence of the Oregon reciprocal rights act.

■ In our opinion, though the question is a difficult one, the United States has failed to sustain the burden of proof of any reciprocal right in American citizens *as such* to inherit during the war years. They were clearly alien enemies and would appear to be ineligible under the commentaries upon German law which we have discussed. Our decision need not, however, rest upon that ground alone. We are in accord with the decision of the appellate court in Peters' case, supra, which held that the decree providing for the escheat of all Jewish property upon death of the owner was relevant, even under the California statute, and certainly it was admissible under the Oregon statute. It is clear that from the date of that decree no person, whether American citizen or otherwise, and whether Jew or gentile, could inherit under the will of any Jew dying in Germany. Again, we agree with the California court in *Miller's Estate*, supra, when it said, "It may very well have been that Hitler, in spite of his hatred for both Jews and Americans, concluded that as a matter of expediency and shrewd business it was advisable to retain reciprocity with the United States * * *", and we agree that to some extent he may have done so, but we conclude that such limited practice did not establish an enforceable legal right on the part of American legatees in view of the numerous provisions of written law which denied such right.

■ We repudiate the contention that the Nazis could discriminate against groups of American citizens and then claim that they were extending reciprocal rights to Americans because they were also discriminating against similar groups of their own citizens. The very purpose of the Oregon statute was to discourage any discrimination against any American citizen, whether or not there was discrimination against others.

■ Finally, we hold that the decree which invalidated any bequest if "grossly opposed to sound sentiment of the people" and to considerations which a decedent who is conscious of his duties to his family and the "community of the people" constituted direct legal authority to administrators or judges to discriminate against various classes of American citizens.

The instances in which American residents and presumably citizens inherited as legatees of German testators, come within the rule stated in *Schluttig's Estate,* supra, 36 Cal2d 416, 218 P2d 819, 224 P2d 695, when that court said:

> "* * * Clearly, when it is shown that the taking of estates by testamentary disposition or succession is a matter of sufferance determinable in accordance with directions of the Nazi officials and their concepts of national sentiment, there is no 'reciprocal right' as that term is used in the Probate Code."

The nebulous provisions of the German decrees vested in German courts and administrators such broad authority, unlimited by the familiar American doctrine of stare decisis that we cannot say that the official recognition of claims of American legatees, if such claims were recognized, was based on anything more than a wide and undefined discretion.

A long and painstaking examination of the enormous record in this case has produced the conviction that the law of the Hitler regime permitted and authorized discriminations against American citizens as such in several situations noted supra, and also unjustly discriminated against American citizens as legatees in common with like discriminations against German legatees. These rights, if such they can be called, bear no resemblance to the rights accorded by Oregon law to German legatees of Oregon testators. Our conclusion is that on 8 December 1943 reciprocal rights did not exist within the meaning of OCLA, § 61-107. The decree awarding the property to the Attorney General of the United States as successor to the Alien Property Custodian is reversed. The cause is remanded to the circuit court for determination of rights as between the State of Oregon claiming the property as an escheat and the intervener claiming as alleged American citizen and heir of John Krachler. Neither party will recover costs.